## FORD v. CASPERS.

### Civ. No. 1120.

District Court, N. D. Illinois, E. D.

Nov. 26, 1941.

McNab, Holmes & Long, by Allan W. Cook and Joseph T. Scott, all of Chicago, Ill., for plaintiff.

Hirsch E. Soble and Warren Canaday, both of Chicago, Ill., for defendant.

CAMPBELL, District Judge.

The plaintiff in 1933 consulted the defendant, a real estate agent, regarding the plaintiff's building known as the Wau Bun Apartments on which he was then in default on payments on the bonded indebtedness and on payment of taxes. Plaintiff was concerned over his personal liability on his bonds and a possible deficiency decree in a foreclosure suit. There ensued many conferences and telephone conversations between plaintiff and the defendant as well as much correspondence and the execution of many deeds and other documents by the plaintiff. In 1939 the defendant emerged as the owner of the Wau Bun Apartment Building and the vacant lot adjoining. The threatened foreclosure had been completed with no deficiency decree against plaintiff.

Plaintiff brings this suit contending that in their said transactions, the defendant was his agent for the limited purpose of acquiring certain bonds and disposing of his title to the said property in accordance with his directions and that the defendant without his knowledge or consent acquired title to the property himself and therefore must be held to account to the plaintiff. The defendant on the other hand contends that he merely contracted with the plaintiff to relieve him of liability on approximately 75% of the bonded indebtedness against said property and that he has done this. Further, that the plaintiff was willing to part with title to the property if he could be so relieved and that if in the process the defendant should himself acquire title to that property it is no concern of the plaintiff since the plaintiff was not compensating him for his services and he had to look to the "deal" for his remuneration.

The evidence does not bear out either contention. The evidence clearly shows that the plaintiff, an elderly man with considerable business experience and substantial wealth, voluntarily consulted the defendant in 1933 for the purpose of arranging to avoid his personal liability on the bonds which he signed and which were secured by a trust deed against the Wau Bun building. He and the defendant did devise a scheme of hindering the bondholders from collecting against Ford on their bonds. The plaintiff executed deeds drawn by the defendant, conveying all other properties which he owned to various nominees who were his relatives. These were recorded and then the defendant drew other deeds which were executed by the said nominees conveying the same properties back to the plaintiff and which were not recorded. Various other steps were taken to make it impossible for the plaintiff's creditors to ascertain his real worth and to realize anything except the property which had been pledged. The fact that Wau Bun bonds were subsequently purchased for the trifling consideration which plaintiff now complains the defendant paid for them was due to the fact that he, through the connivance and assistance of the defendant, made himself appear judgment-proof when as a matter of fact he was not. By his subterfuge the plaintiff did successfully prevent most of his bondholders from collecting against him personally. It is inconceivable that they would have sold their bonds for the trifling consideration brought out by the evidence in this case had they realized the

true worth of the plaintiff. Therefore, the plaintiff's fraud in this transaction extends right down through the entire history of his dealings with the defendant to the last sale of a bond.

That the plaintiff knew what was going on and that he was engaged in a shady transaction is also evident. In one of his own letters (plaintiff's exhibit 17) he suggests that he and his co-conspirator, the defendant, need not have a letter get out of their hands if each destroys their copy of the same, thus, "It will never be known that you furnished me any information." This is but one of the instances of the knowledge on the part of the plaintiff that he was engaged in a highly reprehensible transaction. On other occasions he shows a desire to protect his nominees, his daughters and sons-in-law who are of record holding the property for him. Even in his testimony he stated that he desired a release from his liability on the bonds and that it mattered not to him how he got it.

The plaintiff now complains that he was deceived by the defendant in his transactions with him particularly in having his nominees execute deeds in 1937 to the defendant's nominee. I have no doubt that he was, at least partially. But the plaintiff put himself in position to be thus deceived and even defrauded by his own illegal actions in attempting to deceive and defraud his bondholders.

The plaintiff says that in good faith he consulted the defendant for much needed advice in connection with his property. A man of the plaintiff's business experience, wealth and position knew well that reliable attorneys were available in 1933 in the City of Chicago to advise him in connection with the impending foreclosure on his property. In his many years of business dealings in Chicago the plaintiff must have become acquainted with several such attorneys. Instead of consulting any reliable attorney, however, he chose to do business with a layman, no doubt fully realizing that what this layman did for him no reliable attorney would consider doing. Furthermore, at no time during his entire period of transactions with the defendant did he discuss the matter of the defendant's compensation. Certainly he must have concluded that the defendant expected some recompense for his services. Apparently the defendant had no doubts in this regard.

All of the exhibits, all of the testimony clearly demonstrates that the plaintiff and the defendant set out in 1933 to do an unlawful act, to wit: to hinder, delay and defraud creditors of the plaintiff and to make a mockery of the processes of a local Court of Chancery that was about to adjudicate the issues involved in a foreclosure suit on his property. If in his desire to cheat his creditors the plaintiff has himself been cheated by his co-conspirator, it certainly is not now the function of this Court of Equity to decide which of the conspirators out-conspired the other. While the Court agrees with the well written platitudes in the conclusion of the brief and argument for the plaintiff, the Court feels that these preachments might more appropriately be directed to the plaintiff himself by his counsel.

■ There is a motion pending before the Court. It is the motion of the defendant to strike the plaintiff's reply brief. The plaintiff's reply brief does seem in parts to attack the defendant's counsel personally, due probably to the limited usable facts at disposal of plaintiff's counsel. This unfortunately at times has occurred on both sides. I shall permit the plaintiff's reply brief to stand on the assumption that where it transgresses the bounds of propriety it is merely another such inadvertence.

The defendant's motion is denied.

The complaint will be dismissed at plaintiff's costs for want of equity. The Clerk is directed to enter the necessary minute orders.

### Findings of Fact.

1. In early June, 1933, plaintiff, an elderly man of considerable business experience and substantial means, voluntarily consulted defendant, a real estate broker in Chicago, Illinois, for the purpose of arranging to avoid plaintiff's personal liability on $30,000 of bonds which he had signed and which were secured by a trust deed against the Wau-Bun Building, an apartment building situated in Chicago, Illinois. The bond issue matured on or about June 20, 1933. There was past due on the property $9,800 general taxes, exclusive of penalties; the building required about $12,000 to $14,000 in repairs and was half vacant; and there was a claim against plaintiff of $3,500 on a past due judgment note in favor of a coal company for coal, besides minor claims. A bondholders' meeting was set for June 16, 1933. Plaintiff considered the property a hopeless loss.

2. Plaintiff was seriously concerned that a deficiency decree or judgment on the bond issue would follow his unencumbered property, real and personal, located in

Florida, Indiana and in Illinois. Plaintiff told defendant he did not care what means defendant used to bring about his avoidance of liability on the bonds, but he wanted it brought about.

3. Plaintiff and defendant did then, or shortly thereafter, devise a scheme of hindering, delaying, and defrauding the bondholders from collecting against plaintiff on the bonds. Plaintiff executed deeds drawn by defendant conveying all of plaintiff's real estate, in Illinois, Indiana and Florida, including the Wau-Bun property, to his daughters and their husbands residing in Indiana. Those deeds were recorded. At or about the same time, other deeds drawn by defendant and executed by the said nominees, reconveying the same properties to plaintiff and his wife, were taken back by plaintiff. The latter deeds were not recorded. Plaintiff was not indebted to his daughters or their husbands.

Later in 1933, plaintiff through defendant's efforts secured a supposed extension agreement extending the maturity on the Wau-Bun bond issue several years.

4. In 1934, the County Treasurer of Cook County, Illinois, was appointed tax receiver of the Wau-Bun property, and remained in that capacity through 1938 until this matter was disposed of. Defendant and his firm were retained by the County Treasurer as managing agents of the property during the entire period because of personal considerations between the County Treasurer and defendant.

5. On February 16, 1937, one Kleinman, a bondholder, instituted in the Circuit Court of Cook County, Illinois, a suit to foreclose the trust deed on the Wau-Bun property. At that time, several years' interest had mounted up, taxes and cost of repairs had increased, and the entire situation had grown worse. Several months later, in 1937, the Wau-Bun property and the vacant lot adjacent thereto were conveyed by plaintiff's said daughters and their husbands, at the request of plaintiff, to defendant's nominee. A decree of foreclosure was rendered in said proceeding on February 26, 1938. Pursuant to said decree, the Wau-Bun property was sold on or about July 21, 1938, to a nominee of defendant for $3,600.

6. Shortly after the institution of the said foreclosure proceeding, plaintiff again voluntarily consulted defendant for the purpose of evading a deficiency decree. Various steps were taken by the parties to make it impossible for the bondholders to ascertain the plaintiff's real worth and to realize anything except the Wau-Bun property which had been pledged. In 1938, both before and after the foreclosure sale, defendant purchased Wau-Bun bonds in the principal amount of $24,500. He also received $1,500 of the bonds from plaintiff in 1937. In February, 1939, defendant exhibited the $26,000 of the bonds to plaintiff, stated to him that the plaintiff should consider himself dismissed on the liability on those bonds, and stated further to him that he would pay plaintiff for his $1,500 bonds approximately the same as he paid other bondholders. Shortly thereafter, defendant paid plaintiff $105 for the plaintiff's $1,500 bonds. The $24,500 bonds were purchased by defendant at greatly reduced prices because plaintiff, through the connivance and assistance of defendant, made himself appear judgment proof, when as a matter of fact he was not. By this subterfuge, plaintiff successfully prevented most of his bondholders from collecting against him personally. No deficiency judgment or decree was ever rendered against plaintiff.

7. Plaintiff knew what was going on, and that he was engaged in a shady transaction.

Plaintiff and defendant set out in 1933 to do an unlawful act, to-wit: to hinder, delay and defraud creditors of the plaintiff and to make a mockery of the processes of a local Court of Chancery that was later to adjudicate the issues involved in the foreclosure suit on the Wau-Bun property, and they accomplished it. The plaintiff's fraud in this transaction extends right down through the entire history of his dealings with the defendant, and with his bondholders.

### Conclusions of Law.

1. In his desire to cheat his creditors, the plaintiff complains that he has himself been cheated by his co-conspirator, the defendant. It is not the function of this Court of Equity to decide which of the conspirators out-conspired the other.

2. Where a conveyance has been made for the purpose of hindering, delaying or defrauding creditors of the grantor, or where anticipated danger of litigation has influenced the conveyance, equity will not interpose to restore to the grantor the title to the property so conveyed, or to make the grantee account therefor.

3. Where two parties are engaged in an unlawful transaction, and in the accomplishment of an illegal or fraudulent purpose and one which is contrary to good morals and public policy, and one party obtains property or profits claimed by the other, the law will not aid either party, but will leave the parties in the situation in which they have placed themselves.

4. Where two or more persons engage in a fraudulent transaction to injure another, neither law nor equity will interfere to relieve either of those persons as against the other from the consequences of their own misconduct.

5. Where a transaction is tainted with fraud as between the parties to it, the Courts will not assist either, but will leave them in the position in which it finds them.

6. The defense of unclean hands need not be pleaded at all in order to be considered by the Court. When the evidence discloses the fraud or illegality or unconscionable character of a transaction, the Court, whether the defense is pleaded or not, will of its own motion apply it. It is one which the Court itself is bound to raise in the interest of the due administration of justice. It cannot be obviated or waived by any system of pleading, or even by express stipulation of the parties.