**Herman S. NATHANSON and Gladys Nathanson, Plaintiffs,**

v.

**WEIS, VOISIN, CANNON, INC., Defendant.**

**No. 70 Civil 215.**

United States District Court, S. D. New York.

April 9, 1971.

**51**

Battle, Fowler, Stokes & Kheel, New York City, for plaintiffs; Raymond F. Gregory, Joel M. Walker, Robert S. Bernstein, New York City, of counsel.

London, Buttenwieser & Chalif, New York City, for defendant; Ephraim S. London, New York City, of counsel.

EDWARD WEINFELD, District Judge.

This is a motion by the defendant, Weis, Voisin, Cannon, Inc., engaged in the business of securities brokerage and securities underwriting, and a member of national stock exchanges, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The action was commenced by plaintiffs, husband and wife, to recover damages for losses sustained by them in the purchase of securities of TST Industries, Inc. (TST). It is not disputed, for the purposes of this motion, that the defendant was an "insider" with respect to TST and also Elgin National Watch Company (Elgin). At the time of the purchases, the defendant owned a controlling percentage of TST stock, and TST owned a substantial number of the issued shares of Elgin.[1] The defendant's President was Chairman of the Board of each corporation; other officers and directors of the defendant were also directors of each corporation; and eight of the eleven directors of Elgin were also directors of TST.

The complaint contains two counts, the first charging violations of sections 12 and 17 of the Securities Act of 1933[2] and section 10(b) of the Securities Exchange Act of 1934[3] and Rule 10b–5 promulgated thereunder,[4] and the second charging common law fraud. Plaintiffs, in addition to recovery of the losses allegedly sustained by them in the purchase of TST stock, also seek punitive damages.

In substance, the claim is that plaintiffs received material "inside information" from the defendant's officers and agents that TST and Elgin were about to merge; that the defendant's agents and representatives made false and misleading statements to plaintiffs that the merger would be on the basis of one share of TST stock for one share of Elgin stock; that they were assured if they purchased TST securities the exchange ratio at the time of merger would be on a one to one basis; that in reliance upon such representations plaintiffs were induced to purchase TST common stock, warrants and convertible debentures; that the defendant knew that the exchange ratio would not be as stated, but that each share of Elgin stock would be exchanged for at least two shares of TST stock; that when the alleged false and misleading statements were made, the market value of Elgin stock was approximately $17 a share and the market value of TST approximately $8 a share; that plaintiffs had no knowledge of the alleged falsity of the statements until several months after they had purchased TST securities.

1. Approximately 35% of the issued and outstanding common stock and approximately 73% of the issued and outstanding 6% convertible debentures of Elgin were owned by TST.

2. 15 U.S.C. §§ 77l, 77q.

3. 15 U.S.C. § 78j(b).

4. 17 C.F.R. § 240.10b–5.

What all this adds up to is that plaintiffs assert they received in advance of a merger material "inside" information from the defendant—in effect they were tipped off to buy $8 stock, which upon the merger's consummation would be exchanged for stock priced at double on the market, all of which turned out not to be so.[5] When the merger was consummated, the actual exchange ratio was 2½ shares of TST for each share of Elgin.

■ The defendant understandably brands plaintiffs' claim "absurd on its face," but accepts, only for the purposes of this motion, the allegations of the complaint as to the representations, their materiality, their falsity, plaintiffs' reliance thereon and damages, and upon that premise urges it is entitled to summary judgment dismissing plaintiffs' complaint. Defendant's position is that plaintiffs are barred from recovery under the doctrine of in pari delicto, since they themselves violated the antifraud provisions of the securities laws by purchasing TST stock on the open market without making available to the sellers of the stock all information relevant to the transactions, including the proposed exchange basis.[6]

The precise issue has not been decided by our Court of Appeals. However, two cases upon somewhat analagous facts lend support to the defendant's position. In one, Kuehnert v. Texstar Corp.,[7] by a divided court the Fifth Circuit held that the defense of in pari delicto was sufficient to bar plaintiffs' recovery.[8] The other ruling, Wohl v. Blair & Co.,[9] permitted the defense to stand as against a motion to strike, but to await final determination upon a trial, since the question was "not free from doubt," and raised "serious and substantial legal issues which should be more fully explored before being finally resolved."

■ The issue, as both courts have noted, is a close one. The basic question, as this court views it, centers not about the claims asserted by plaintiffs against the defendant or the defense advanced in resistance to those claims, but rather about third parties not involved in the litigation—the investing public and what policy with respect to the allowance or disallowance of the

---

5. Between August 12, 1968, and October 22, 1968, plaintiffs purchased 5000 shares of TST common stock on the New York Stock Exchange through the defendant broker; also on November 8, 1968, plaintiffs made direct purchases from the defendant of 12 units consisting of 12 TST $1000 bonds, 2400 shares of TST common stock, and 1200 TST warrants.

6. SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 848, (2d Cir.), cert. denied sub. nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968); see also Kuehnert v. Texstar Corp., 412 F.2d 700 (5th Cir. 1969); Financial Ind. Fund, Inc. v. McDonnel Douglas Corp., CCH Fed.Sec.L.Rep. ¶ 92,811 (D.Colo. Sept. 16, 1970); Matter of Investors Management Co., Inc., CCH Fed.Sec.L. Rep. ¶ 77,832 (S.E.C. June 27, 1970); Matter of Cady, Roberts & Co., 40 S.E.C. 907 (1961). The legislative history of the Securities Exchange Act clearly indicates that the Act is intended to provide protection to both buyers *and sellers* on the securities market who rely on the representations of those with whom they are dealing, since "no investor * * * can safely buy and sell securities * * * without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells." H.R.Rep. No.1383, 73rd Cong., 2d Sess. 11 (1934).

7. 412 F.2d 700 (5th Cir. 1969) (Godbold, J., dissenting).

8. The majority position, however, recognized that the application of the defense "rests with the discretion of the court. * * * The question [of an in pari delicto defense] must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public." *Id.* at 704. Unlike the factual situation in the instant case, in *Kuehnert* the broker and the corporate insider were not the same person, and the plaintiff's nondisclosure to the broker constituted a fraud against him upon which he could have sued had he sustained a loss.

9. 50 F.R.D. 89, 93 (S.D.N.Y.1970).

defense would best serve to carry out the prime purpose of the securities laws to protect the investing public.[10] So viewed, I have concluded that the defense of in pari delicto, or its broader equitable counterpart, the doctrine of unclean hands,[11] must yield to overriding public policy considerations in order to secure effective enforcement of the anti-fraud provisions of the securities acts by discouraging insiders, brokers and others with superior market information from disclosing such information to a favored group before it is made available to the public.[12]

The starting point for discussion is whether the unavailability of the in pari delicto defense will further the purposes behind the statutes and the regulations.[13] It is unnecessary to set forth at length the basic purposes of the securities acts which have been considered in many decisions since their enactment and are the subject of a host of articles and textbooks. The dominant congressional policy underlying the Securities Exchange Act of 1934 was recently articulated in SEC v. Texas Gulf Sulphur Co.,[14] as designed "to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges." [15] The court further observed that implementing Rule 10b–5 "is based in policy on the justifiable expectation of the securities marketplace that all investors * * * have relatively equal access to material in-

---

10. This court, a number of years ago, considered the same issue with respect to the defense in antitrust suits. After reviewing cases involving patent infringement and antitrust violations, the court stated:

> "It may be acknowledged that no sharply defined principle emerges from all these cases, some of which are not altogether consistent. What does appear, however, is that the defenses of 'unclean hands' and 'in pari delicto' were not considered solely within the framework of traditional equity concepts. In determining whether the defense should be permitted or denied, decisive weight was given to the necessity of vindicating the public interest in free competition—a necessity overriding the particular equities which might exist between the immediate parties."

Trebuhs Realty Co. v. News Syndicate Co., 107 F.Supp. 595, 598 (S.D.N.Y. 1952).

11. While the defense of in pari delicto in cases arising under the securities laws generally contemplates equal and simultaneous participation by the parties in the same illegal activity, see Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 89 (S.D.N.Y.1968), aff'd, 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969), the doctrine of unclean hands, although infrequently applied, serves to deny relief to the fraudulent or miscreant plaintiff whether or not he directly participated in the defendant's illegal acts. See Gaudiosi v. Mellon, 269 F.2d 873, 881–882 (3d Cir.), cert. denied, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959).

12. See SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1956) ("A fundamental purpose [of the securities laws] * * * was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.") ; see also H.R.Rep.No.85, 73rd Cong., 1st Sess. 2 (1933) ; cf. Wilko v. Swan, 346 U.S. 427, 435, 74 S.Ct. 182, 186, 98 L.Ed. 168 (1953) ("While a buyer and seller of securities, under some circumstances, may deal at arm's length on equal terms, it is clear that the Securities Act was drafted with an eye to the disadvantages under which buyers labor. Issuers of and dealers in securities have better opportunities to investigate and appraise the prospective earnings and business plans affecting securities than buyers.").

13. Cf. Pearlstein v. Scudder & German, 429 F.2d 1136, 1147 (2d Cir. 1970) (Friendly, J., dissenting), cert. denied 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971).

14. 401 F.2d 833 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).

15. Id. at 848.

formation * * *." [16] And the court held that the essence of the Rule required inside directors or management officers who had access to information intended to be available only for a corporate purpose either to disclose it to the investing public before taking personal advantage of it or to abstain from trading in or recommending securities of the issuer as long as the information remained undisclosed.[17] The proscription of the Rule, moreover, was also held to be "applicable to one possessing the information who may not be strictly termed an 'insider' within the meaning of Section 16(b) of the Act," thus bringing within its sweep "tippees." [18]

These broad policy purposes must be considered in conjunction with the means of their enforcement. While no private right of action is expressly provided under section 10(b), such a right has been judicially implied there-

under,[19] and also under other sections of the Exchange Act,[20] since "private actions by market investors are a highly effective means of protecting the economy as a whole from violations by brokers and dealers." [21] Thus, such private suits under the securities acts may be considered to parallel actions by aggrieved parties under the antitrust laws with their treble damage provisions as a means not only of redressing a private wrong, but also of protecting the public interest.[22]

In considering whether protection of the public interest and effective enforcement of the overall purposes of the securities acts justify overriding the particular equities which may exist between immediate private litigants, the fact, here urged by the plaintiffs, that the inside information received by them was false and hence did not constitute a fraud upon the public investors whose shares were purchased is quite beside

---

16. *Id.*

17. The prohibition was first articulated by Chairman Cary in Matter of Cady, Roberts & Co., 40 S.E.C. 907, 915 (1961):
 "The practical problems * * * in effecting appropriate disclosures in connection with transactions on the Exchange are easily avoided where * * * all the registered broker-dealer need do is to keep out of the market until the established procedures for public release of the information are carried out instead of hastening to execute transactions in advance of, and in frustration of, the objectives of the release."
 *See generally* Fleischer, Securities Trading and Corporate Information Practices: The Implications of the Texas Gulf Sulphur Proceeding, 51 Va.L.Rev. 1271 (1965).

18. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968); *see* Ross v. Licht, 263 F.Supp. 395, 409–410 (S.D.N.Y.1967); *cf.* Levine v. Seilon, Inc., 439 F.2d 328, at 333 n. 8 (2d Cir. 1971).

19. As one court has stated, "nothing * * * would more certainly tend to deter fraudulent practices in security transactions

* * * than the right of defrauded sellers or buyers of securities to seek redress in damages in federal courts." Fratt v. Robinson, 203 F.2d 627, 632 (9th Cir. 1953). *See also* Ellis v. Carter, 291 F.2d 270, 272–73 (9th Cir. 1961); Fischman v. Raytheon Mfg. Co., 188 F. 2d 783, 787 (2d Cir. 1951); Brennan v. Midwestern United Life Ins. Co., 259 F. Supp. 673, 676 (N.D.Ind.1966); Kardon v. National Gypsum Co., 69 F.Supp. 512, 514 (E.D.Pa.1946).

20. *See e. g.*, J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (section 14(a)); Junger v. Hertz, Neumark & Warner, 426 F.2d 805 (2d Cir. 1970) (section 7(c)); Dann v. Studebaker Packard Corp., 288 F.2d 201 (6th Cir. 1961) (section 14(a)); Remar v. Clayton Sec. Corp., 81 F.Supp. 1014 (D.Mass.1949) (section 7(c)). *See generally* Note, Implying Remedies From Federal Regulatory Statutes, 77 Harv.L. Rev. 285 (1963).

21. Pearlstein v. Scudder & German, 429 F.2d 1136, 1140 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L. Ed.2d 550 (1971).

22. *Cf.* United States v. Standard Ultramarine & Color Co., 137 F.Supp. 167, 171 (S.D.N.Y.1955).

the point.[23] The information was not disclosed to the holders of TST stock who sold to the plaintiffs.[24] The tippees, the plaintiffs here, were engaged in a potential fraud against the sellers of the TST stock by buying their shares, as plaintiffs believed, at one-half their actual value. The information as to the exchange basis of the shares of the two corporations involved in the contemplated merger was material, and certainly it cannot be denied that had the sellers of the TST stock been apprised of the information possessed by the purchasing insiders, here the plaintiffs, their business judgment as to whether to buy, sell or hold on to their securities would have been affected.[25] The selling investors, had they known of the alleged inside information, might not have sold the stock or they might have deemed it prudent to purchase additional shares of TST, since there was the potentiality of appreciated value upon the consummation of the merger. Of course, the tippee, when he acts on his inside information, believes it to be true. And in his transactions, whether purchases or sales, he is overreaching or attempting to overreach the public investor on the basis of his private knowledge. In sum, plaintiffs were engaged in transactions designed to take advantage of the unknowledgeable holders of TST stock. Their conduct with respect to the investing public was similar to that attributed by them to the defendant, and such conduct constituted a fraudulent practice.[26]

However, plaintiffs' own recreant conduct, while a factor to be considered on the issue of whether the defense of in pari delicto is available to the defendant is not determinative.[27] Again

23. In responding to a similar contention by the plaintiff in that case, the *Kuehnert* majority observed that there is no "difference in substance between a successful fraud and an attempt. The statutory phrase 'any manipulative or deceptive device,' 15 U.S.C. § 78j(b), seems broad enough to encompass conduct irrespective of its outcome." Kuehnert v. Texstar Corp., 412 F.2d 700, 704 (5th Cir. 1969).

24. Since the November 8 purchases were made directly from TST, they are arguably outside the scope of the disclosure rule, but that question is not relevant to this motion.

25. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).

26. One argument made in favor of permitting the defense against the tippee is that otherwise a "heads I win, tails you lose" situation in his favor is created and in effect gives him a built-in indemnity against loss. *Cf.* Pearlstein v. Scudder & German, 429 F.2d 1136, 1148 (2d Cir. 1970), cert. denied 401 U.S. 1013, 91 S. Ct. 1250, 28 L.Ed.2d 550 (1971) (Friendly, J., dissenting); *see also* Kuehnert v. Texstar Corp., 412 F.2d 700, 705 (5th Cir. 1969). If the information is true, he can take advantage of it, and if false, he may recover from his informant for losses sustained in acting on the tip. While there is a surface appeal to this contention, it must be considered against the overall purpose of the securities acts. Moreover, if the advance information is true and the tippee has profited from it at the expense of public investors, he is subject to suit for damages by the overreached, unknowledgeable investors. While as has been suggested in *Kuehnert*, 412 F.2d at 705 (majority opinion); *see also id.* at 706 (Godbold, J., dissenting), such individuals may be difficult to locate, or may even be unaware of the deception, these are not necessarily insurmountable difficulties, as reported cases attest.

27. As one Court of Appeals has noted in considering the availability of the defense in a securities case:

"An investor does not waive or lose the shelter of the Act because he becomes to some extent involved in the illegality of the security sales. The reason for such rule has been aptly stated:

'In such event, since the policy of the law designed to discourage illegal agreements comes in conflict with that policy which demands the effective enforcement of the Corporate Securities Act, the law differentiates the guilt of the parties, because refusal of relief to the less culpable would involve harmful effects wholly out of proportion to the requirements of individual punishment or the discouragement of illegal contracts. Williston on Contracts, 1938 Ed. vol. VI, pp. 5085, 5086, § 1789.' Miller v.

to be considered is the third party, the public, and what policy will best afford protection to it as intended under the securities acts. A strong suggestion of the unavailability of the defense of in pari delicto in securities violations is given by the recent ruling of the Supreme Court in Perma Life Mufflers, Inc. v. International Parts Corp.[28] There the Supreme Court held in an antitrust suit that the doctrine of in pari delicto did not bar a retailer from suing a manufacturer for treble damages and to strike down an illegal tying restriction which he had helped to create and from which he had previously benefited.[29] True, *Perma* was based upon the antitrust laws, where Congress' purpose to secure auxiliary enforcement by private treble damage actions was clearly manifested; also, it is recognized that *Perma* involved a

dealer who had been coerced into joining the illicit agreement, whereas here plaintiffs voluntarily acted upon their inside information in purchasing shares on the national stock exchange. Nonetheless, it appears that the fundamental purpose of the securities acts in the prevention of fraud, manipulation or deception in connection with securities transactions and in compelling adherence by insiders to their duty to disclose material inside information before acting upon it, would better be achieved by disallowing rather than allowing the defense.[30] So, too, support for its rejection is found in the recent case of Pearlstein v. Scudder & German,[31] involving transactions in violation of the margin requirements of the Exchange Act,[32] where the majority was of the view that "such a defense does not appear desirable in the

California Roofing Company, 55 Cal. App.2d 136, 130 P.2d 740, 745."
Can-Am Petroleum Co. v. Beck, 331 F.2d 371, 373 (10th Cir. 1964).

28. 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed. 2d 982 (1968).

29. The degree of the plaintiff's involvement in the illegal scheme was held to be irrelevant by the Court:
"The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy * * *. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement." 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed. 2d 982 (1968).
*See also* Simpson v. Union Oil Co. of Calif., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) (dealer who had signed consignment agreement permitted to challenge validity of agreement under antitrust laws) ; *cf.* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (plaintiff's private antitrust suit not barred by proof that he had engaged in unrelated conspiracy to violate antitrust laws). *See generally* Note, In Pari Delicto and Consent as Defenses in Private Antitrust Suits, 78 Harv.L.Rev. 1241 (1965).

30. *See* nn. 12, 17, 19 *supra.* Furthermore, it should be noted that the policies underlying the private enforcement of the antitrust laws and the securities acts are quite similar. *Compare* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138–139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) *with* J. I. Case Co. v. Borak, 377 U.S. 426, 431–433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). "In both situations, private litigation serves to deter violations and to encourage injured parties to expose violators to the public. Moreover, unlike the antitrust laws which subject all participants in an unlawful scheme to liability, the margin requirements [for example] regulate only the broker." Note, 5 Georgia L.Rev. 166, 177 (1970). While the disclosure requirements in section 10(b) of the Exchange Act have broader applicability than the margin requirements of section 7(c) of the Act, brokers and issuers of securities are generally subjected to closer scrutiny under the Act than other persons, since they "have better opportunities to investigate and appraise the prospective earnings and business plans affecting securities * * *." Wilko v. Swan, 346 U.S. 427, 435, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

31. 429 F.2d 1136, 1141 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971).

32. 15 U.S.C. §§ 78g(a), (c) ; 12 C.F.R. §§ 220.4(c) (2), (7).

securities area here involved, even when the investor may be shown to have had knowledge of margin requirements." The court at another point noted: "In our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policy effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission." [33]

 As between the broker-dealer, here the insider, and the tippee, here the plaintiffs, the broker-dealer presents a greater potential threat to undermining the statutory protection intended for the public investor. In pari delicto generally contemplates that both parties are "in equal fault."[34] But this is not the usual situation between the tipper and tippee and their positions are not necessarily equal. Generally, "inside information" is made available by corporate insiders to a select or favored group.[35] The true insider or the broker-dealer is at the fountainhead of the confidential information, whereas the tippee or the customer may be only one of many who innocently or otherwise receives a tip, and whose potential for harm is minimal as compared to that of the original source of the information. While it is true that each is in a position to take advantage of the public investor, the greater threat to the investor is posed by the original insider, usually an important corporate official or a broker-dealer, or sometimes, as here, a combination of both. In this case it is reasonable to infer that defendant's representatives, also officers and directors of both TST and Elgin, knew that plaintiffs would utilize the confidential information to their advantage by purchases of TST stock in the open market; otherwise what reason was there for its advance disclosure of the alleged one-for-one exchange of stock upon the merger. In fact, the purchases were executed on the Stock Exchange through the defendant. If the prophylactic purpose of the law is to restrict the use of all material inside information until it is made available to the investing public, then the most effective means of carrying out this policy is to nip in the bud the source of the information, the tipper, by discouraging him from "making the initial disclosure which is the first step in the chain of dissemination."[36] This can most readily

---

33. Pearlstein v. Scudder & German, 429 F.2d 1136, 1141 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971). Even prior to *Pearlstein*, several courts had permitted private plaintiffs to maintain actions arising under the securities laws despite their own involvement in the illegal activity charged in their complaints. Katz v. Amos Treat & Co., 411 F.2d 1046, 1054 (2d Cir. 1969) ; Can-Am Petroleum Co. v. Beck, 331 F.2d 371, 373–374 (10th Cir. 1964) ; cf. Hooper v. Mountain States Securities Corp., 282 F.2d 195, 207–208 (5th Cir.), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1960) ; Rosenberg v. Hano, 121 F.2d 818, 822 (3d Cir. 1941).

Finally, it is noteworthy that the Fifth Circuit decision in Kuehnert v. Texstar Corp., 412 F.2d 700 (5th Cir. 1969), has stimulated critical academic comment urging the rejection of in pari delicto as a defense to private actions brought under the anti-fraud provisions of the securities laws. See, e. g., 54 Minn.L.Rev. 878 (1970) ; 50 B.U.L.Rev. 87 (1970) ; XLIV Tulane L.Rev. 618 (1970) ; 47 No.Caro. L.Rev. 984 (1969) ; cf. Comment, 48 Tex. L.Rev. 181 (1969).

34. *See* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) ; Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 89 (S.D.N.Y.1968), aff'd, 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) ; see also Black's Law Dictionary, 898 (4th ed. 1951).

35. *Cf.* SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y.1966), aff'd, 401 F.2d 833 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968) ; Matter of Cady, Roberts & Co., 40 S.E.C. 907 (1961).

36. Kuehnert v. Texstar Corp., 412 F.2d 700, 706 (5th Cir. 1969) (Godbold, J., dissenting).

be achieved by making unavailable to him the defense of in pari delicto when sued by his tippee upon charges based upon alleged misinformation. Only in this way is it likely that the insider, who is really in a fiduciary position,[37] will retain the confidentiality of his inside corporate knowledge until it is made available to the investing public. Since he is the source of the misinformation, he should not benefit by this defense; denying it to him can serve as an effective deterrent to premature disclosures of material inside information.

The motion for summary judgment is denied.

---

37. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).