**James J. JAMES, Plaintiff-Appellant,**

v.

**George W. DuBREUIL, Defendant-Appellee.**

**No. 73-2954.**

United States Court of Appeals, Fifth Circuit.

Sept. 12, 1974.

Richard P. Kenney, Irving M. Wolff, Miami, Fla., for plaintiff-appellant.

Robert C. Ward, Miami Beach, Fla., for defendant-appellee.

Before MOORE*, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

Plaintiff James brought this suit under section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5, 17 C.F. R. § 240.10b–5, and Florida statutes dealing with unlawful securities transactions.[1] He seeks rescission and cancellation of an agreement with defendant DuBreuil for the sale of securities transferred in accordance with the agreement. Plaintiff also seeks damages and injunctive relief.

In his complaint, plaintiff alleges that defendant, an organizer and director of Inter National Bank of Miami, fraudulently induced plaintiff to sell to him 2,260 shares of common stock of Inter National for inadequate consideration. The fraudulent misrepresentation charged to defendant is that he falsely and knowingly represented to plaintiff that if plaintiff sold his shares to defendant, the shares would have greater financial value pursuant to the terms and conditions of a merger between Inter National and Royal Trust Company of Canada. The basic provisions of the merger are alleged to constitute material information withheld by defendant. The complaint further states that consideration for the securities sale was payment of $56,500, and an agreement to divide equally between the parties all consideration over and above $30 per share received by defendant upon exchange of the 2,260 Inter National shares for shares of Royal Trust. Plaintiff alleges that defendant exchanged the Inter National shares for 4,362 shares of Royal Trust stock, but has failed to account to plaintiff for his interest in the Royal Trust shares. Defendant's answer to the complaint denied the material allegations and, as an affirmative defense, pled that the stock purchase complained of by plaintiff resulted solely from defendant's exercising an option to repurchase Inter National shares that plaintiff had given defendant in July of 1966 when defendant sold the shares to plaintiff.

A trial was held before the district court sitting without a jury. After presentation of plaintiff's case, the court rendered judgment for defendant.[2]

From the evidence presented by plaintiff in the district court, we discern the following events relevant to this appeal.

_____

* Hon. Leonard P. Moore, Senior Circuit Judge of the Second Circuit, sitting by designation.

1. Fla.Stat. §§ 517.21, 517.22, 517.23, 517.25, 517.27, 517.28, 517.301.

2. At the close of plaintiff's evidence, defendant moved for what was termed a "directed verdict." Since the court was sitting without a jury, this motion is properly denominated a motion for dismissal for insufficiency of the evidence under Fed.R.Civ.P. 41(b). See Trask v. Susskind, 5 Cir., 1967, 376 F. 2d 17, 19; C. Wright, Federal Courts 428 (1970); Wright & Miller, Federal Practice and Procedure § 2371.

In a press release dated July 20, 1971, it was announced that Royal Trust Company of Canada and Inter National Bank of Miami had reached an agreement in principle pursuant to which Royal Trust would seek to acquire Inter National through merger by exchanging Royal Trust's stock for stock of Inter National. In the late afternoon of July 21, 1971, defendant came to plaintiff's office and suggested that if plaintiff would turn over his Inter National stock to defendant, defendant could place the stock in an organizers' trust agreement that would considerably enhance the value of the stock in the proposed merger between Inter National and Royal Trust. Negotiations ensued, and an understanding was reached that called for plaintiff to sell to defendant 2,260 shares of Bank stock at $25 per share. Plaintiff then summoned his secretary, who prepared certain written documents relating to the sale of the stock. The basic agreement was prepared in the form of a note, wherein plaintiff and defendant agreed that upon future sale of the stock all funds received over $30 per share would be divided equally between plaintiff and defendant. Two promissory notes from defendant to plaintiff were also prepared. One note was for $10,000, representing indebtedness of defendant to a corporation acting as plaintiff's nominee. The other note was for $56,500, an amount representing the purchase price of 2,260 shares at $25 per share. There was, however, one stumbling block. Since the merger was subject to then-existing Securities and Exchange Commission Rule 133, 17 C.F.R. § 230.133 (rescinded, effective January 1, 1973), insiders were precluded by the Rule and SEC regulations and rulings from acquiring stock for a definite interval prior to announcement of the intended merger, unless they had a written option to acquire the stock executed prior to the limitation period. In order to circumvent this proscription of the securities laws, the three documents were predated to June 29, 1971. The documents were then executed by the parties.

The records of Inter National show that 2,260 shares of its stock were transferred from plaintiff to defendant on July 21, 1971. The stock certificate issued to plaintiff and sold to defendant, however, bears the signature of plaintiff and the date of June 29, 1971. Notations by a bank employee on the certificate indicate that the certificate was surrendered to the bank on July 21, 1971.

On July 27, 1971, defendant met with plaintiff and advised him that it was necessary that a preexisting option agreement be prepared as substantiation of defendant's prior right of purchase of the stock in order to avoid the impact of the securities laws. Plaintiff and defendant then went to the office of defendant's attorney, and the attorney, in the absence of his secretary, drew the option by hand and directed that it be predated to July 7, 1966. Apparently, this date was chosen because it was about that time that defendant had first offered and sold to plaintiff's nominee certain shares of Inter National that defendant had received in the bank's organization. The hand-drawn option was taken by plaintiff's office, where it was typed verbatim by plaintiff's secretary, and the document was executed by plaintiff and defendant.

On March 1, 1972, an Agreement and Plan of Reorganization between Royal Trust and Inter National was entered into, and, on June 13, 1972, Inter National entered into a merger agreement with Royal Trust. The merger and reorganization were approved at a special Inter National stockholders' meeting, and defendant exchanged 2,395 shares of Inter National stock for 4,622 shares of Royal Trust stock.

At the trial, plaintiff claimed that, in order to induce plaintiff to enter into the sale agreement, defendant falsely represented that plaintiff, as a stockholder, could not partake of the merger since the stock he held was subject to an organizers' voting trust that in fact did not exist and that the stock would be more valuable in defendant's hands because he was part of the organizers'

trust. Plaintiff also asserted that defendant withheld from him the material fact that plaintiff, were he to be a dissenting shareholder, would be entitled by law to have an evaluation made of his shares and to be paid accordingly. *See* 12 U.S.C. § 215a(b), (c) and (d).

It was defendant's position at trial, when called by plaintiff as an adverse witness, that there had been no backdating of the documents relating to his option to purchase the stock from plaintiff or of the documents evidencing the sale.

■■ In dismissing plaintiff's suit, the district court pointed out in its findings and conclusions that if the testimony given by plaintiff was not believed, then plaintiff has no cause of action. On the other hand, the court said, if plaintiff's testimony is believed, "he was a co-conspirator with the defendant in an intended act of fraud and deceit." Finding that plaintiff "was just as involved as defendant was," the court concluded that plaintiff should be barred from maintaining this suit against defendant by virtue of this Court's decision in Kuehnert v. Texstar Corporation, 5 Cir., 1969, 412 F.2d 700, which recognized the availability of the defenses of unclean hands and in pari delicto in securities fraud cases and held that their application rests in the sound discretion of the district court. *See* Wolf v. Frank, 5 Cir., 1973, 477 F.2d 467, 474; Clement A. Evans & Co. v. McAlpine, 5 Cir., 1970, 434 F.2d 100, 104; Wohl v. Blair & Co., S.D.N.Y., 1970, 50 F.R.D. 89. *See also* 1969 Duke L.J. 832, 838.[3]

Plaintiff's appeal challenges the alternate holding applying these defenses. We hold that the district court properly applied the defenses to bar maintenance of plaintiff's suit and affirm.

Kuehnert v. Texstar Corporation, *supra*, presented a situation in which defendant Rhame, then president of Texstar Corporation, informed Kuehnert that Texstar was in the process of negotiating a merger agreement and that Texstar had made secret discoveries, as a result of which an enormous increase in the value of the stock could be expected. Rhame also told Kuehnert that he wished to keep these discoveries secret while the two of them bought enough stock to acquire working control of the company. Consequently, on the basis of this information, Kuehnert bought a substantial amount of company stock on margin in the open market, and, because the representations of secret discoveries proved to be false, he lost it all. The Court termed Kuehnert "in fact a dupe, but [one] who believes he is a tippee with a duty to disclose, and who endeavors to take wrongful advantage of his tip." 412 F.2d at 703. The Court saw it necessary to determine, first, whether actual unclean hands and in pari delicto were defenses to recovery in private Rule 10b–5 antifraud actions, and second, whether any distinction was suggested because "Kuehnert knowing nothing, concealed nothing, and hence did not defraud his vendors." *Id.* at 704. Seeing "no sufficient public interest when the only question is one of accounting between joint conspirators," *id.* at 703, the Court held that actual illegal

3. Plaintiff asserts that the district court committed reversible error because it failed to enter findings of fact and conclusions of law prior to entry of judgment in favor of defendant, as required by Fed.R.Civ.P. 52(a). We reject plaintiff's contention. Separate findings and conclusions were entered by the court, quoted in part in text, *supra* page 157; and they are clearly sufficient. *See generally* J. Moore, 5A Moore's Federal Practice ¶ 52.05 [1], at 2690–91 (2d ed. 1974, Supp.) :

[T]here is compliance by the trial court with the mandate of [Rule 52] when ei-

ther a separate statement of findings of fact and conclusions of law or an opinion reveal an understanding analysis of the evidence, a resolution of the material issues of "fact" that penetrate beneath the generality of ultimate conclusions, and an application of the law to those facts.

*See also id.* at ¶ 52.01 [1] n. 9, at 2691: While the degree of particularity must necessarily be gauged to the case at hand, it should be sufficient to indicate the factual basis for the ultimate conclusion.

conduct should act as a bar to recovery. It further held that there was no substantial difference between an attempted fraud and a successful fraud, the absence of actual harm to Kuehnert's vendors being a "pure fortuity." *Id.* at 704.

The Court then set forth a standard by which district courts are to exercise their discretion in applying the defenses of unclean hands and in pari delicto:

> The question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public.

*Id.* at 704. The Court reasoned that

> If a tippee can sue he has, in effect, an enforceable warranty that secret information is true. It is then that he will have free rein. If what he is told is false, he can recover against his informer. If it is true, he will, of course, be liable to his vendors or vendees, but here he may well be protected by the difficulties of discovery. It may be relatively easy to trace insiders; tippees are another matter.

(Footnote omitted.)

*Id.* at 705.[4] It was, therefore, concluded that the defenses were properly permitted by the district court on the facts presented because "the better choice is to leave upon persons believing themselves tippees the restraint arising from the fear of irretrievable loss should they act upon a tip which proves to have been untrue." *Id.* at 705. *See generally* 1969 Duke L.J. 832, 839.

There are certain features of *Kuehnert* that we think are compelling in determining whether the court below properly exercised its discretion. In reaching its initial conclusion that the in pari delicto and unclean hands defenses are available in the usual 10b–5 actions, the Court said in *Kuehnert*:

> We would also have no doubt but that Kuehnert would have been in pari delicto had he in fact concealed material information from his vendors. It is irrelevant that Rhame originated the scheme. Rhame, on the assumption that what he told Kuehnert was true, would have violated his duty to the stockholders, and Kuehnert, willingly acquiescing in what seemed a mutually profitable plan, would have taken advantage of precisely that breach and made it effective against the very persons to whom protection was owed. This is not a case of mere knowledge of another party's wrongdoing, without active participation.

*Id.* at 703.

The fraud of which plaintiff complains arises from a fraudulent transaction in which plaintiff was an active participant. Plaintiff voluntarily agreed to join defendant "in what seemed a mutually profitable plan" to violate the securities laws prohibiting insider trading within a certain period of an announced merger.[5] In this sense,

---

4. *See also* A. Bromberg, Tippee Risks and Liabilities, 3 Rev. of Sec. Reg. 875, 880–881 (1970) ; Comment, The Demise of In Pari Delicto in Private Actions Pursuant to Regulatory Schemes, 60 Cal.L.Rev. 572, 591 (1972).

5. We note the following exchange between defendant's counsel and plaintiff:

> Q. And he advised you that there was going to be a sale then and he advised you he wanted to buy your stock or enter into some agreement where you two could share in this so-called insider information?
> A. Well, we considered it a joint venture on the agreement where he had advanced money, information and knowledge, and this is how we drew up the agreement,

based on a contingency, subject to my original purchase, plus his obligation to pay me back the interest, because when I originally bought the stock, I loaned him money . . . to purchase this stock, and then buying it back in April of 1970 there was interest notes that were obligated by myself to [plaintiff's nominee].

With reference to the document evidencing the basic agreement between plaintiff and defendant, the following exchange occurred between defendant's counsel and plaintiff:

> Q. As I read that document, Mr. James, you and Mr. DuBreuil were to divide any profits realized from the sale of the stock at a price of more than $30 a share; is that correct?
> A. That's correct.

their fraud was directed at the same objective. But like Kuehnert, plaintiff was apparently a dupe believing himself to be a tippee. *See id.* at 702–703. Plaintiff's participation in the fraudulent transaction, moreover, was vital to any possible success of the basic fraud involved.[6] The benefit to defendant arose only through the active participation of plaintiff in the fraudulent scheme. The fault of the parties being clearly mutual, simultaneous, and relatively equal, this case is ripe for the application of the in pari delicto defense.[7]

There is one significant factor that makes the case before us a stronger one than *Kuehnert* for the application of the in pari delicto and unclean hands defenses. This concerns the basic policy question about enforcement of the securities laws, which was suggested by the *Kuehnert* Court as the standard for determining whether a district court properly exercised its discretion.[8]

In *Kuehnert* there was a direct involvement of the plaintiff with the public investor. Kuehnert, a tippee, had gone to the open market to purchase Texstar stock. He was acting on confidential information from Rhame and did not disclose the information to his vendors, the public investors. We have no such direct involvement with the public investor on the facts before us. Whereas the *Kuehnert* scheme was one directed from Rhame to Kuehnert and outward to the public investor, the scheme of plaintiff and defendant involved an isolated transaction with the basic fraudulent intent of escaping the impact of the securities laws. If plaintiff was duped in the process, it is not our role to serve as referee in an accounting between coconspirators.[9] To do so would not increase the protections afforded the investing public.

Affirmed.

6. In Pearlstein v. Scudder & German, 2 Cir., 1970, 429 F.2d 1136, 1142 & n. 10, in which the in pari delicto defense was denied in a suit by a customer charging his broker with violation of regulation T, the court distinguished two cases reaching an opposite result on the ground that in those cases the type of fault attributed to the customer went "beyond knowledge of the margin requirements to concealment or misstatement of material facts."

7. *See* Perma Life Mufflers, Inc. v. Intern. Parts Corp., 392 U.S. 134, 153, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968) (Harlan, J., concurring and dissenting): "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." In *Perma Life*, the opinion of the Court indicated that the in pari delicto defense might be allowed as a defense to an antitrust action if the plaintiff was "actively supporting the entire restrictive program as such, participating in its formulation and encouraging its continuation." *Id.* at 140, 88 S.Ct. at 1985.
*See also* Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597, 663 (1972); A. Bromberg, Securities Law: Fraud, SEC Rule 10b–5, § 11.5 & n. 23 (1968); Nathanson v. Weis, Voisin, Cannon, Inc., S.D.N.Y., 1971, 325 F.Supp. 50, 53 n. 11.

8. The court in *Nathanson* disagreed with this Court's reasoning in *Kuehnert* and refused to apply the in pari delicto or unclean hands defense in a 10b–5 suit, finding that the tipper represented "a greater potential threat to undermining the statutory protection intended for the public investor." 325 F.Supp. at 57.

The issue was also well stated by the court in Nathanson v. Weis, Voisin, Cannon, Inc., S.D.N.Y., 1971, 325 F.Supp. 50, 52:
The basic question, as this court views it, centers not about the claims asserted by plaintiffs against the defendant or the defense advanced in resistance to those claims, but rather about third parties not involved in the litigation—the investing public and what policy with respect to the allowance or disallowance of the defense would best serve to carry out the prime purpose of the securities laws to protect the investing public.

9. The principle applied in Ford v. Caspers, N.D.Ill., 1941, 42 F.Supp. 994, 997, aff'd, 7 Cir., 1942, 128 F.2d 884, is pertinent here:
In his desire to cheat his creditors, the plaintiff complains that he has himself been cheated by his co-conspirator, the defendant. It is not the function of this Court of Equity to decide which of the conspirators out-conspired the other.
*See* Kuehnert v. Texstar, *supra*, 412 F.2d at 704.