In re HAVEN INDUSTRIES, INC.
Securities Litigation.

Christine LEMMELIN et al., Plaintiffs,

v.

HAVEN INDUSTRIES, INC., et al., Defendants.

MDL No. M21–18, No. 76 Civ. 2626.

United States District Court,
S. D. New York.

Nov. 29, 1978.

Sarapas, Madaus, Price & Arakelian, Worcester, Mass., for plaintiffs; Robert Martin, Worcester, Mass., of counsel.

Wagner, McNiff & DiMaio, New York City, for defendants Brown's, Berger, Wagner, Kaufman and DiMaio.

Goldstein, Shames, Hyde, Wirth, Bezahler & Cahill, New York City, for National Sugar, Federated Communications Corp., Bilger, Schiffman, Corbin, Airport Services, Oil Resources, and Liederman; Jeffrey I. Klein, New York City, of counsel.

Salon, Silver, McCabe & Sidel, Boston, Mass., for Carpentier; Thomas F. Heffernon, Boston, Mass., of counsel.

James P. Del Guercio by John Y. Chu, Asst. Gen. Counsel, Beverly Hills, Cal., for City National Bank, Kyman City National Bank of Los Angeles.

D'Amato, Costello & Shea, New York City, for Bezahler; Richard McGahren, New York City, of counsel.

Irell & Manella, Los Angeles, Cal., for Green; Louise Wheeler, Los Angeles, Cal., of counsel.

Gifford, Woody, Carter & Hays, New York City, for Harris Upham & Co.; Sheila Maura Kahoe, New York City, of counsel.

Mountain, Dearborn & Whiting, Worcester, Mass., for Oftring & Co., Oftring; Charles B. Swartwood, III, Worcester, Mass., of counsel.

Brown, Rudnick, Freed & Gesmer, Boston, Mass., for Buchalter; Lawrence M. Levy, Boston, Mass., of counsel.

Davis, Polk & Wardwell, New York City, for Ernst & Ernst; Dale L. Matschullat, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge.

This litigation consists of two actions which, by order of the Judicial Panel on Multidistrict Litigation, have been assigned to this court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re Haven Industries, Inc.*, MDL Docket No. 246 (J.P.M.L. June 9, 1976). The action captioned as *Lemmelin v. Haven Industries, Inc.*, 76 Civ. 2626 (LPG) was commenced in the United States District Court for the District of Massachusetts in August, 1975 by forty-eight plaintiffs seeking compensatory and punitive damages against thirty-four defendants. Plaintiffs, purchasers of the stock of Haven Industries, Inc. ("Haven")[1] and related corporations, allege a nationwide conspiracy to create a market for Haven stock and to inflate its value artificially in violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240.10b–5; and § 17(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a). Jurisdiction is premised upon § 27 of the 1934 Act, 15 U.S.C. § 78aa, and § 22(a) of the 1933 Act, 15 U.S.C. § 77v. Various defendants have moved to dismiss the complaint pursuant to Rules 12(b) and 9(b) Fed.R.Civ.P., or, in the alternative, for summary judgment pursuant to Rule 56, Fed.R.Civ.P.

1. Haven changed its corporate name to Federated Communications Corporation after the commencement of this action.

### Statement of Facts

The material facts, as set forth in the amended complaint and the parties' affidavits, are as follows. Plaintiffs purchased shares in Haven and its related companies over the six-year span from 1968 to 1974 through various brokerage firms.[2] Defendant Donald Liederman became Haven's president, director and controlling shareholder in 1968 when Haven was a "bankrupt shell" corporation (Amended Complaint, p. 13). Count I of the amended complaint alleges that Liederman conspired with, among others, the brokerage firms from which plaintiffs purchased their Haven stock to sell large amounts of the worthless stock at artificially inflated prices. After causing Haven to issue large amounts of stock to these brokerage firms at little or no charge and selling large amounts of Haven and related company stock to the public through nominees, Liederman allegedly met with the principals and registered representatives of the defendant brokerage firms and induced them to sell Haven stock to their customers on the basis of false, "inside" information. Customers, including the plaintiffs, were told that "the broker had inside information directly from Liederman as President that a wonderful development was about to take place in Haven's business, that when this information became public knowledge the price of Haven stock would go much higher and that the buyer would, therefore, make a lot of money." (*Id.*, p. 14). In fact, there was no real market for Haven stock and the brokerage firms maintained its price level by reporting sales at higher prices and by selling the stock back and forth between each other. (*Id.*). Public disclosure to the effect that the "wonderful development" in question had not taken place would eventually be made, the artificial price support would be withdrawn and Haven stock would collapse in value. After a suitable delay during which the brokerage firms assured the plaintiffs that their potential losses were due only to temporary market conditions, a new "wonderful development" would be fabricated and the cycle would be repeated. (*Id.*). Despite fluctuations in the rigged market price, Haven was insolvent, its stock was worthless and defendants allegedly knew this to be so. (*Id.*).

In inducing plaintiffs to purchase the stock of Haven and its related companies from 1968 through 1974, the following false "inside" information was disclosed to plaintiffs: 1) that National Hospital Inc. ("National Hospital"), a corporation controlled by Liederman, was about to consummate a favorable merger with American Medicare Corporation ("American Medicorp") which would make National Hospital's stock very valuable; 2) that Haven was to acquire the notes of a valuable company known as Recreational Vehicles, Inc. ("RVI") in return for the sale of Brown's Limousine Services, Inc., ("Brown's"), a Haven subsidiary; 3) that Haven and Oil Resources, Inc. ("Oil Resources"), a Liederman-controlled corporation, were to acquire the stock of Barco of California, Inc. ("Barco"); 4) that Haven was about to sell its stock in the National Sugar Refining Company ("National Sugar"), a Haven subsidiary, for a price which would increase the value of Haven stock from $4.00 to $5.00 per share; 5) that Airport Services, Inc. ("Airport"), Haven's subsidiary, had acquired worldwide marketing rights to the G.R. Valve, a gas-saving device for automobiles; and 6) that Haven

2. Only plaintiff Gabriel Rubin acquired his shares without the aid of a brokerage firm. On April 17, 1970, a written agreement was reached between Pittsburgh Sports Enterprises Inc. ("PSE"), of which Rubin was a stockholder, and defendant Airport Services, Inc. ("Airport"), a Haven subsidiary, by which PSE sold its assets to Airport in return for the right to receive Haven stock. On September 6, 1972, Rubin received 100,000 shares of Haven as part of the consideration in the PSE–Airport transaction. Over Rubin's objection, restrictions upon transfer were placed upon one half of his Haven stock for one year or until their price rose to $2.37 per share. Rubin acquiesced in the restrictions upon transfer on defendant Bezahler's representation that the stock's value would reach the $2.37 level by February or March 1973 as a result of an acquisition planned for the near future. Rubin alleges that when this representation was made, no acquisition was actually contemplated. (Amended Complaint, pp. 5, 33–34).

was about to acquire Media Creations, Ltd. ("Media"), a profitable business engaged in the production of television commercials. (*Id.*, pp. 15–16). Each of these tips was allegedly false or misleading as described in detail below.[3]

The defendants made sales of National Hospital stock to some of the plaintiffs by telling them that Haven's president had informed them that National Hospital was about to sell nine hospitals to American Medicorp and that the sale would greatly increase the value of National Hospital stock. Liederman subsequently disclosed this information publicly in April 1969. In April, 1971, however, Liederman announced that only five hospitals had been sold and that the proceeds of this sale, $16,000,000 in American Medicorp debentures, equaled less than $3.00 per share of National Hospital stock. (*Id.* p. 16).

As to the tip concerning Haven's sale of Brown's to RVI for RVI's valuable notes, plaintiffs allege that several of the individual defendants conspired to acquire Brown's assets for themselves and for RVI. Although Haven disclosed that the sales price for Brown's assets was $580,000, consisting of a $425,000 non-interest bearing convertible note and a $155,000 9% note due in September, 1972, Haven purportedly failed to disclose to plaintiffs that RVI was a "shell" created by defendant Liederman and that RVI had no assets with which to pay any portion of the principal amount and interest. Plaintiffs further contend that on March 29, 1972, RVI compelled Haven to convert the $425,000 note into 223,684 shares of RVI stock. Defendants Robert Green and Co., Inc. ("Green") and J. L. Schiffman and Co., Inc. ("Schiffman"), registered broker-dealers, allegedly maintained an inflated market for RVI shares and Haven incurred a $300,000 loss as a result of the conversion. On April 5, 1972, defendants Liederman and Alvin Schwartz, an officer and director of both RVI and Brown's, initiated an agreement between Haven and Brown's pursuant to which no inter-company transactions would be permitted for two years thereby preventing Brown's from paying to Haven any debts owned by RVI. (*Id.*, pp. 16–18).

Plaintiffs also allege that Brown's prospectus of December 31, 1972 prepared by defendant law firm Wagner, Kaufman & DiMaio ("Wagner"), contained several misstatements and omissions. While that prospectus stated that defendant Schwartz had agreed to purchase 405,000 RVI shares from Haven and others, it allegedly failed to disclose that Schwartz had agreed simultaneously to sell those shares to nominees for defendants Schwartz and Liederman and that these persons planned to resell the shares publicly at an inflated market price of $1.25 per share in conjunction with a planned public offering of Brown's stock. In 1972, Haven allegedly agreed to sell 150,000 of its shares to Schwartz for $37,500 on condition that Schwartz resell his RVI shares to the nominees for eventual public resale. Haven did not disclose the existence of this agreement until its proxy statement of August 31, 1973, at which time it falsely disclosed that the agreement had been reached in March 1973 and omitted Schwartz's name in order to conceal his identity. Defendant Wagner, a New York law firm which acted as counsel to Brown's and RVI, knew of the scheme to resell these shares and induced defendant Paul Gerstner to act as escrow agent for Schwartz and his nominees. (*Id.*, pp. 18–20).

Plaintiffs charge Haven and defendant Donald Bezahler, the corporation's secretary-treasurer, with falsely disclosing in Haven's August 31, 1973 Proxy Statement that Haven exchanged the $155,000 9% note it had received as part of the consideration for the sale of Brown's assets for 47,500 shares of Brown's unregistered stock when, in fact, Haven's officers, Bezahler and Liederman, had been informed by the Wagner law firm that any such transfer would violate the agreement between Brown's and RVI prohibiting inter-company transactions. Bezahler and Liederman allegedly

---

3. The amended complaint alleges that defendants used the requisite instrumentalities of interstate commerce in furtherance of their scheme.

failed to disclose that the 47,500 shares were never delivered by RVI to Haven as a result of Wagner's disapproval. Nevertheless, Haven and its accountant, Ernst & Ernst, falsely listed the 47,500 shares as an asset on Haven's financials. In 1974, Wagner obtained a default judgment against RVI and thereby recovered RVI's sole asset—its 350,000 shares of Brown's stock. Wagner then began to loot Brown's assets. Defendants Bezahler and Liederman were allegedly informed of this development but took no action to protect the interest of Haven or its shareholders despite RVI's outstanding indebtedness to Haven. In its Form 10–K for the period ending December 31, 1973, Haven disclosed that it was writing off its entire investment in RVI and Brown's as "worthless". (*Id.*, pp. 20–22).

As to the tip concerning Haven's acquisition of Barco stock, plaintiffs further allege that Liederman caused Haven to purchase 10,000 shares of Barco common stock at inflated prices for the benefit of sellers including defendant Irwin Buchalter, a principal in both Haven and Barco, and others related to Liederman. Haven failed to disclose that Buchalter was an officer, director and shareholder of Barco or that Liederman had caused Oil Resources to purchase 17,500 shares of Barco at an average price of $14 per share just prior to Haven's purchase of Barco shares at $19 per share. Haven also allegedly failed to disclose that Buchalter and others were able to sell Barco shares at inflated prices because Liederman purchased over 10% of Barco's publicly traded shares through Haven and Oil Resources. Brokers Green and Schiffman, at Liederman's direction, allegedly maintained markets in Barco's stock and thereby aided and abetted the scheme to cause its market value to rise. (*Id.*, p. 23).

During November and December 1972, Liederman allegedly manipulated the market for Haven stock so as to cause the market value of its stock to double temporarily from $.62 per share to $1.25 per share. Despite his knowledge of material adverse information relative to Haven's financial condition in October, 1972, Liederman purportedly directed defendant brokers Green, Schiffman, Lerner & Co., Inc. ("Lerner"), and Oftring & Co. Inc. ("Oftring & Co.") to purchase Haven shares based upon his false statement that Haven was about to sell its interest in National Sugar for a price that would cause Haven stock to be worth from $4.00 to $5.00 per share. Several plaintiffs were told by these brokers and their registered representatives that Liederman, as Haven's president, had given them this inside information and were thereby induced to purchase Haven shares. Haven, however, was unable to sell National Sugar at a price equal to its book value and it had not received an offer to purchase National Sugar from anyone. In April, 1973, Haven finally disclosed that over $15 million of its $25 million investment in National Sugar had to be written off as a loss, but allegedly neglected to state that National Sugar would have to be sold at any price to avoid bankruptcy. (*Id.*, pp. 23–25).

In March, 1974, Liederman, brokerage houses Lerner, Green, Schiffman, Harris Upham & Co. ("Harris Upham") and others allegedly engaged in a scheme to inflate the price of Haven's shares. Haven had previously negotiated for the acquisition of the marketing rights to the "G.R. Valve", a gas saving device for automobiles manufactured by N.C. Industries, Inc. ("N.C."). Liederman and defendant Hartley Lord, a Haven director, disclosed the proposed acquisition to the defendant brokerage firms to induce them to buy Haven shares, and to sell them to the public prior to Haven's public disclosure of the deal. The brokerage firms first purchased such a large quantity of Haven stock that its market price tripled between March 11 and March 31, 1974. The firms then sold Haven and Airport stock to plaintiffs on the basis of inside information concerning Haven's plans to acquire the marketing rights. In furtherance of the scheme, Liederman sent several G.R. Valves to various brokers to give them to plaintiffs in order to persuade them to purchase Haven stock. The market price of Haven stock was also artificially inflated in this period due to the brokerage firms' sell-

ing stock back and forth between themselves. On April 1, 1974, Haven issued a press release announcing the acquisition of the marketing rights but failed to disclose that Haven's rights would not be exclusive. Although N.C. terminated the agreement on October 2, 1974 on the ground that Haven had misrepresented its capability and intent, Haven allegedly failed to disclose this information. Defendant Green allegedly continued to spread false information concerning N.C. marketing rights after N.C. completed plans to market its product through another corporation. (*Id.*, pp. 25–28).

On September 10, 1974, Haven announced plans to acquire assets of defendant Media Creations Ltd. ("Media") but allegedly failed to disclose that the purpose behind the transaction was to utilize Haven's assets to rescue Media from financial disaster and to benefit Media shareholders. Haven also failed to disclose that: 1) it had loaned Media $150,000; 2) a long time relationship existed between the principals of Haven and Media; and 3) Media shareholders would control Haven's board of directors upon approval of the proposed acquisition. (*Id.*, pp. 29–30).

Plaintiffs contend that the defendants "made every effort" to prevent them from selling their Haven stock once they had purchased it. Defendants allegedly employed unspecified "legal pressures" as well as false statements concerning the stock's future value to induce plaintiffs to retain their holdings. (*Id.*, p. 31).

Counts II, III and IV of the amended complaint incorporate by reference the allegations of Count I. In Count II, plaintiffs contend that the defendants who bought or sold the stock of Haven and its related companies did so on the basis of inside information in violation of the securities laws. (*Id.*, p. 35). Count III charges that the defendant brokerage firms failed to ex-

ercise due care in the supervision of the activities of their respective registered representatives in permitting them to use fraudulent sales methods. (*Id.*, pp. 35–36). Similarly, in Count IV, plaintiffs allege that defendants Ernst & Ernst, Wagner and Haven directors Liederman, Bezahler, Buchalter, Nathan Bilger and Niel Rosenstein failed to exercise due care as accountants, lawyers and directors by neglecting to discover, report or prevent the fraud that was perpetrated upon plaintiffs.

Count V arises out of a transaction unrelated to the Liederman scheme. Nine plaintiffs allege that defendants Oftring & Co., its president Frank Oftring and its registered representative Nelson Carpentier sold them stock in a corporation known as Tilco on the representation that it had developed an efficient steam engine for automobiles that would be an immensely successful product. Plaintiffs contend that these three defendants knew that Tilco dealt in oil and gas leases and had not developed any such engine. Tilco subsequently went bankrupt and plaintiffs lost their entire investment. In addition, two plaintiffs allege that defendant Carpentier sold them stock in Investors Funding Corporation ("IFC") by representing that this corporation was a bank and that its stock was a safe investment. Carpentier allegedly knew, however, that IFC was not a bank but rather was engaged in the highly speculative business of making second mortgage loans. This company, too, failed and, as a result, the two plaintiffs lost their entire investment. (*Id.*, pp. 36–37).

### The Motion to Dismiss Count I on the Ground of In Pari Delicto

Eighteen defendants have moved to dismiss Count I of the amended complaint on the ground that plaintiffs are *in pari delicto* with the defendants.[4] The movants con-

---

4. The moving defendants are Haven, Liederman, Airport, National Sugar, Bezahler, Bilger, Corbin, Wagner, Berger, Oil Resources, Buchalter, Green, Werdesheim, Schiffman, Oftring & Co., Frank Oftring, Carpentier and Ernst & Ernst. Of this group, Haven, Liederman, Air-

port, National Sugar, Bilger, Corbin, Oil Resources, Werdesheim, Schiffman, Carpentier, and Ernst & Ernst have previously filed answers in this action; Bezahler, Buchalter, Green, Oftring & Co., Frank Oftring and Carpentier have made prior motions to dismiss;

tend that plaintiffs admit to having purchased Haven shares on inside information and thus must be barred from recovering from the defendants even though the inside information they received was allegedly false.

█ The common law doctrine of *in pari delicto,* meaning "of equal fault", is "fashioned to assure that transgressors will not be allowed to profit from their own wrongdoing." *Tarasi v. Pittsburgh Nat'l. Bank,* 555 F.2d 1152, 1156 (3d Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977). The doctrine bars a party from recovering damages if his losses are substantially caused by "activities the law forbade *him* to engage in." *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 154, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968) (Harlan, J., concurring and dissenting) (emphasis in original). When plaintiff's fault in bringing about his loss is substantially equal to that of the defendant, he is not entitled to recover. *Id.* at 147–48, 88 S.Ct. 1981 (Fortas, J. concurring).

█ Trading on non-disclosed inside information clearly violates § 10(b) of the 1934 Act and Rule 10b–5. In *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the Court of Appeals for this Circuit observed that:

> The core of Rule 10b–5 is the implementation of the Congressional purpose that all investors should have equal access to the rewards of participation in securities transactions. It was the intent of Congress that all members of the investing public should be subject to identical market risks . . . [And] inequities based upon unequal access to knowledge should not be shrugged off as inevitable in our way of life, or, in view of the

congressional concern in the area, remain uncorrected.

*Id.* at 851–52. Consequently, the Second Circuit formulated a "disclose or abstain" rule: anyone possessing material inside information must either disclose it to the investing public or must abstain from trading in or recommending the securities concerned so long as the inside information remains undisclosed. *Id.* at 848. In applying this rule, the courts have refused to distinguish between "tippers"—those who violate Rule 10b–5 by disclosing inside information to individuals who subsequently trade on the basis of that information—and trading "tippees"—those who trade on the selectively disclosed information. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228 (2d Cir. 1974); *Green v. Hamilton Int'l. Corp.,* 437 F.Supp. 723, 728 & n. 3 (S.D.N.Y.1977); *Ross v. Licht,* 263 F.Supp. 395, 410 (S.D.N.Y.1967).

█ The issue presented by this motion is whether plaintiffs, who allege that the defendant brokerage firms' representations that they possessed inside information about Haven induced plaintiffs to purchase Haven shares, are precluded from recovery for fraud. The fact that the inside information received by plaintiffs was allegedly false "is quite beside the point." *Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F.Supp. 50, 54 (S.D.N.Y.1971); *accord, Kuehnert v. Texstar Corp.,* 412 F.2d 700, 704 (5th Cir. 1969). Plaintiffs were nevertheless "tippees" when they received this information [5] and by failing to disclose it publicly upon purchasing Haven stock they engaged in a potential fraud against all contemporaneous sellers of Haven stock.

> Of course, the tippee, when he acts on his inside information, believes it to be true. And in his transactions, . . . he is overreaching or attempting to overreach the public investor on the basis of his

---

and Wagner and Berger have neither moved nor answered. Affidavits have been submitted by both the plaintiffs and the defendants on this motion. Because the parties have treated the motion as one for summary judgment, the court will treat it as such.

5. Plaintiffs' contention that they were not true "tippees" because they received their false inside information indirectly from the brokerage firms, rather than directly from Liederman as Haven's president, is not persuasive. *See Wohl v. Blair & Co.,* 50 F.R.D. 89, 92 n. 1 (S.D.N.Y. 1970).

private knowledge . . . [His] conduct with respect to the investing public [is] similar to that attributed by [him] to the defendant, and such conduct constitute[s] a fraudulent practice.

*Nathanson v. Weis, Voisin, Cannon, Inc., supra,* 325 F.Supp. at 55.

█ Few cases have considered the application of the *in pari delicto* doctrine to suits by "tippee" plaintiffs against "tippers" and these authorities are divided in opinion.[6] In *Tarasi v. Pittsburgh National Bank, supra* and *Kuehnert v. Texstar Corp., supra,* the Courts of Appeals for the Third and Fifth Circuits respectively ruled that *in pari delicto* precluded "tippees" from suing their "tippers". 555 F.2d at 1156; 412 F.2d at 705.[7] By contrast, Judge Weinfeld of this district concluded that the defense was unavailable to the "tipper" defendant in *Nathanson v. Weis, Voisin, Cannon, Inc., supra,* 325 F.Supp. at 56–58. As the transferee court in this multidistrict litigation, this court must apply the law of the transferor forum. *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 406 (2d Cir. 1975); *In re Plumbing Fixtures Litigation,* 342 F.Supp. 756, 758 (J.P.M.L.1972). The Court of Appeals for the First Circuit and the District of Massachusetts, however, have not yet addressed the issue. Thus, this court's difficult task is to determine what these courts would rule were they to confront the issue.

As the courts that have decided this issue have recognized, choosing between the two alternative views does not merely involve the allocation of loss between private parties. The real issue is one of public policy: whether or not permitting the defense will "promot[e] the objective of the securities laws by increasing the protection to be afforded the investing public." *Kuehnert v. Texstar Corp., supra,* 412 F.2d at 704. In *Nathanson,* Judge Weinfeld reasoned that "the greater threat to the investor is posed by the original insider" because he is "at the fountainhead of the confidential information." 325 F.Supp. at 57.

If the prophylactic purpose of the law is to restrict the use of all material inside information until it is made available to the investing public, then the most effective means of carrying out this policy is to nip in the bud the source of the information, the tipper, by discouraging him from "making the initial disclosure which is the first step in the chain of dissemination." This can most readily be achieved by making unavailable to him the defense of *in pari delicto* when sued by his tippee upon charges based upon alleged misinformation.

*Id.* (citation omitted). In *Tarasi* and *Kuehnert,* however, Judges Adams and Aldrich noted that elimination of the *in pari delicto* defense eliminates any incentive for the "tippee" to refrain from using inside infor-

**6.** The doctrine has been applied to prohibit co-conspirators in a § 10(b) scheme from recovering against each other. *See, e. g., Malamphy v. Real-Tex Enterprises, Inc.,* 527 F.2d 978 (4th Cir. 1975) (per curiam); *James v. DuBreuil,* 500 F.2d 155 (5th Cir. 1974). In *Perma Life Mufflers, Inc. v. International Parts Corp., supra,* the Supreme Court considered the doctrine's application to treble damage actions under the antitrust laws. The case yielded five separate opinions and its implications are unclear. Although Justice Black's lead opinion concluded that "the doctrine of *in pari delicto,* with its complex scope, contents and effects, is not to be recognized as a defense to an antitrust action," 392 U.S. at 140, 88 S.Ct. at 1985, it reserved the question "whether truly complete involvement and participation [by the plaintiff] in a monopolistic scheme" could serve as the basis of a defense. *Id.* at 140–41, 88 S.Ct. at 1985. Careful analysis of all the opinions reveals that five of the Justices agreed that a plaintiff would be barred from obtaining damages in those cases in which his fault was relatively equal to the culpability of the defendants. *Tarasi v. Pittsburgh Nat'l. Bank, supra,* 555 F.2d at 1158 & n. 27. Whatever the implications of *Perma Life,* the disparities in market power between the parties which militate against the application of the *in pari delicto* defense in the antitrust context are irrelevant here. Plaintiffs' decisions to purchase Haven stock, while partially uninformed, were wholly voluntary. *Kuehnert v. Texstar Corp., supra,* 412 F.2d at 704.

**7.** In *Wohl v. Blair & Co.,* 50 F.R.D. 89 (S.D.N.Y. 1970), Judge Mansfield, intimating support for this view, denied a motion to strike the defense of *in pari delicto* because it raised "serious and substantial legal issues." *Id.* at 93.

mation and, indeed, gives him "an enforceable warranty that the secret information is true." *Kuehnert v. Texstar Corp., supra,* 412 F.2d at 705; *accord, Tarasi v. Pittsburgh Nat'l. Bank, supra,* 555 F.2d at 1163–64. If what has been disclosed is false, he can recover against the tipper; if the inside information is true, he is virtually certain to make an illegal profit. Although the "tippee" is then potentially liable to his vendors or vendees for violating Rule 10b–5, his remoteness from the insider group may, as a practical matter, make it difficult to discover him and thus effectively insulate him from liability. By contrast, substantial deterrents to "tippers" would remain in the form of SEC and criminal actions as well as private suits by non-"tippee" purchasers and sellers who have been adversely affected by the selective disclosure of inside information. Indeed, in the case with which this action has been co-ordinated, *Binstein v. Haven Industries,* 74 Civ. 4792, the non-"tippee" plaintiff raises virtually identical claims to those of the instant "tippee" plaintiffs.

The choice between these alternative views is not an easy one, particularly because each of them rests upon non-verifiable conclusions about the effects of their application. On balance, however, this court believes that the transferor forum would opt for preservation of the *in pari delicto* defense for several reasons. First, permitting the doctrine of *in pari delicto* to bar "tippee" recovery is presently the majority rule. *Cf. Patch v. Stanley Works (Stanley Chem. Co. Div.),* 448 F.2d 483, 488 (2d Cir. 1971) (proper to refer to "majority rule" when applicable state law is uncertain). Second, the *Kuehnert* decision, though originating from the Fifth Circuit, was authored by Judge Aldrich of the First Circuit sitting by designation. Finally, this court believes that the First Circuit would share its perception that sanctioning the *in*

*pari delicto* defense is the wiser of alternative policies. Elimination of the defense would remove the most effective disincentive against the "tippee's" use of inside information. Because of the tippee's relatively low visibility, the threat of discovery and potential liability is slight. By contrast, "tippers" are usually highly visible officers, directors or brokerage firms, subject to extensive statutory disclosure requirements, SEC enforcement actions and private suits by non-"tippee" purchasers or sellers. "[E]nforcement of the securities laws against putative 'tippers' by means of private suits will not be impaired to any great extent [by allowing the defense] since suits by 'tippees' are relatively infrequent, especially when compared to the volume of Rule 10b–5 suits brought by other classes of plaintiffs." *Tarasi v. Pittsburgh Nat'l. Bank, supra,* 555 F.2d at 1164. This court thus concludes that the defense of *in pari delicto* is available to defendants and precludes plaintiffs from recovery on Count I. Accordingly, Count I is dismissed as to all eighteen moving defendants.[8]

### *The Motion to Dismiss Count II*

██ The same defendants have moved to dismiss Count II of the amended complaint, which reads in its entirety:

The plaintiffs incorporate by reference the allegations of Count I and say that the defendants who bought or sold the stock of Haven or its related companies did so on the basis of inside information in violation of the Securities Act including the sales plans of the defendants and the fact that the information to be given to the public investors were in large part false and fraudulent.

Defendants contend that Count II fails to state a claim because: 1) absent an allegation of fraud, only an issuer may recover for insider trading in its shares pursuant to § 16(b) of the 1934 Act, 15 U.S.C. § 78p(b);

---

8. The courts that have found the defense to be available in the tipper-tippee context have nevertheless noted that application of the doctrine in any one case "rests with the discretion of the court." *Kuehnert v. Texstar Corp., supra,* 412 F.2d at 704. Plaintiffs' lack of sophis-
tication in securities investment is not sufficient reason, in and of itself, to relax the application of the *in pari delicto* defense. *See Tarasi v. Pittsburgh Nat'l. Bank, supra,* 555 F.2d at 1154.

and 2) the amended complaint fails to allege fraud. While defendants are correct in their reading of § 16(b), *see Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), Count II does incorporate by reference Count I's allegations and may fairly be read to allege that various defendants sold stock to plaintiffs on the basis of undisclosed inside information (*i. e.,* that their representations to plaintiffs about Haven's future prospects were false) in violation of § 10(b) and *Texas Gulf Sulphur's* "disclose or abstain" rule. Read this way, however, Count II alleges only that the defendant "tippers'" incomplete disclosure to plaintiffs caused plaintiffs' losses. In its discussion of Count I, this court concluded that plaintiffs' losses were caused as much by their own violation of the law as by the acts of the defendants and that they were thus precluded from recovery under the doctrine of *in pari delicto.* For the reasons stated above, Count II is also dismissed as against the moving defendants.

### The Motion to Dismiss Plaintiffs' § 17 Claim

■ Seventeen defendants[9] have moved to dismiss plaintiffs' claim under § 17(a) of the 1933 Act[10] for failure to state a claim contending that no civil remedy is provided by that section. There is obviously no explicit civil remedy provided for by § 17(a), a criminal provision, but plaintiffs argue that an implied private remedy has been recognized under this provision. The Supreme Court has never addressed this issue and there is appellate authority on both sides. *Compare Daniel v. International Brotherhood of Teamsters,* 561 F.2d 1223, 1244–46 (7th Cir. 1977), *appeal argued,* —— U.S. ——, 99 S.Ct. 790, 59 L.Ed.2d —— (1978) (recognizing § 17 cause of action) *with Shull v. Dain, Kalman & Quail,* 561 F.2d 152, 159 (8th Cir. 1977) (rejecting § 17 cause of action). The Court of Appeals for the First Circuit has never addressed the issue, but the one district court within that Circuit to reach the issue has rejected the § 17(a) claim in a carefully reasoned decision, *Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890, 903–05 (D.Me.1971). *Accord, Emmi v. First Manuf. Nat'l. Bank,* 336 F.Supp. 629, 632 (D.Me. 1971). *See also* 3 Loss, Securities Regulation 1784–85 (2d ed. 1961). Assuming, for the sake of argument, that the First Circuit would recognize such a remedy, the elements of the § 17(a) cause of action would be identical to the universally recognized § 10(b) cause of action;[11] *see SEC v. Texas Gulf Sulphur, supra,* 401 F.2d at 864 (Friendly, J. concurring), and § 17(a) plaintiffs would presumably be subject to the same defenses as § 10(b) plaintiffs. The doctrine of *in pari delicto* would thus bar plaintiffs from asserting § 17(a) claims against these defendants and their motion to dismiss those claims is granted.

### The Motion to Dismiss Counts III and IV

■ Counts III and IV of the amended complaint charge various defendants with failure to exercise due care either in failing

**9.** The movants include: Liederman, Airport, National Sugar, Bezahler, Bilger, Corbin, Wagner, Berger, Oil Resources, Buchalter, Green, Werdesheim, Schiffman, Oftring & Co., Frank Oftring, Carpentier and Harris Upham.

**10.** 15 U.S.C. § 77q(a): It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**11.** The § 17(a) cause of action would differ only in that that section prohibits fraudulent conduct in the offer or sale of any securities, whereas § 10(b) prohibits fraud "in connection with the *purchase* or sale, of any security." For the purposes of this discussion, this distinction is irrelevant.

to supervise their employees or in neglecting to discover and disclose the fraud. Defendants Liederman, Bezahler, Bilger, Brown's, Berger, Buchalter, Green, Werdesheim, Schiffman, Oftring & Co. and Ernst & Ernst have moved to dismiss these counts for failure to allege "scienter"—the intent to defraud. After *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), it is clear that a defendant's mere negligence will not give rise to § 10(b) liability. The amended complaint does not explicitly state that these counts arise under state law, and the principles of pendent jurisdiction are not specifically alleged to be a jurisdictional basis. From plaintiffs' memoranda of law, however, it may be inferred that they purport to raise common law negligence claims and to invoke this court's pendent jurisdiction.

The court undoubtedly has the power to decide the state claims presented. Plaintiffs' federal claims, though dismissed pretrial, are not so obviously insubstantial as to prohibit the exercise of pendent jurisdiction, *Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), and the federal and state claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In considering whether to exercise its discretionary power to decide the pendent claims, however, the court is mindful of the Supreme Court's admonition that:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.* at 726, 86 S.Ct. at 1139. Accordingly, the court declines to exercise jurisdiction over Counts III and IV, and they are dismissed for lack of subject matter jurisdiction.

## City National and Kyman's Motion to Dismiss for Improper Venue

■ Defendants City National and its officer Alex Kyman have moved to dismiss the amended complaint for improper venue, Rule 12(b)(3), Fed.R.Civ.P. City National is alleged to be a national banking association, and defendants claim the benefit of the limited venue provision of the National Bank Act, 12 U.S.C. § 94, which provides that "[a]ctions and proceedings against any [national banking] association under this chapter may be had in any district . . . court of the United States held within the district in which such association may be established." Federal courts have consistently held that the place specified in a bank's charter as its home office is determinative of the district in which the bank is "established" under this statute. *Buffum v. Chase Nat'l. Bank*, 192 F.2d 58, 60 (7th Cir. 1951). City National's charter establishes Beverly Hills, California as its principal place of business.

In *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976), the Supreme Court ruled that § 94 is the exclusive venue provision governing suits against a national banking association. In a suit brought pursuant to the 1934 Act, the Court held that § 94's specific venue requirement takes precedence over the 1934 Act's broad venue provision, § 27, 15 U.S.C. § 78aa, which allows suits to be brought anywhere the Act is violated or where a defendant does business or can otherwise be found. *Id.* at 152, 96 S.Ct. 1989. Accordingly, City National's motion to dismiss for improper venue is granted. As to defendant Kyman, however, it appears that § 94 applies to national banks, but not their officers. Kyman's motion is therefore denied.

## Harris Upham's Motion to Dismiss

■ Defendant Harris Upham has moved to dismiss the complaint for failure either to state a claim or to plead fraud with particularity. Rules 9(b), 12(b)(6), Fed.R. Civ.P. Harris Upham is mentioned only three times in the amended complaint. The amended complaint alleges that: 1) in October, 1972, Liederman allegedly directed

Harris Upham and other brokers, to sell Haven shares to unspecified "others" based upon Liederman's false inside information that Haven was about to sell its interest in National Sugar at a price which would cause Haven's stock to rise in value; (amended complaint, p. 24); 2) in March, 1974, Liederman, Harris Upham and the other brokers conspired to inflate the market price of Haven's shares on the basis of false inside information concerning the acquisition of marketing rights to the G.R. Valve (*Id.*, p. 25); and 3) Harris Upham and the other brokers conspired with Liederman to violate the terms of a consent order prohibiting Liederman from associating with broker-dealers. (*Id.*, p. 30). Plaintiffs have not alleged that Harris Upham made any misrepresentations or omissions in dealing with them; indeed, none of the plaintiffs alleges that he purchased shares through Harris Upham. Even if these conclusory allegations are sufficient to withstand a motion to dismiss, the amended complaint "in no way attempts to delineate among the defendants [as to] their participation or responsibilities in the activities which are the subject of this suit", and thus fails to plead fraud with particularity as required by Rule 9(b). *Lerman v. ITB Management Corp.*, 58 F.R.D. 153, 155 n. 2

(D.Mass.1973). *Accord, Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972).

Were this the only deficiency in the amended complaint, the court would grant Harris Upham's motion to dismiss subject to plaintiffs' filing a properly amended complaint within thirty days. As discussed previously, however, the doctrine of *in pari delicto* would preclude plaintiffs' recovery under § 10(b) or § 17(a) even if the complaint contained the requisite specificity. Accordingly, Harris Upham's motion to dismiss is granted with prejudice.

### Conclusion

Counts I and II are dismissed with prejudice as against defendants Haven, Liederman, Airport, National Sugar, Bezahler, Bilger, Corbin, Wagner, Berger, Oil Resources, Buchalter, Green, Werdesheim, Schiffman, Oftring & Co., Frank Oftring, Carpentier, Ernst & Ernst and Harris Upham based upon the applicability of the *in pari delicto* defense. Counts III and IV are dismissed without prejudice as against all defendants for lack of subject matter jurisdiction. The amended complaint is dismissed as to defendant City National for improper venue.[12]

12. Several motions remain to be considered. First, plaintiffs have moved to amend the complaint by naming additional parties plaintiff and by adding allegations against City National for acting as "principal banker of Haven and Liederman" and against all defendants for concealing the existence of the cause of action from plaintiffs after they had purchased their stock. The motion to add additional parties is denied with leave to renew since it is unclear from plaintiffs' papers whether or not these putative plaintiffs would also allege purchases of stock on the basis of false inside information and would thus be *in pari delicto* with defendants. Any subsequent motion to amend must set forth these plaintiffs' theory of recovery. The motion to add allegations against City National is denied due to the impropriety in venue. As to the proposed allegations concerning concealment of plaintiffs' causes of action, the motion to amend is denied because the allegedly concealed claims are barred by the *in pari delicto* doctrine in any event.

Plaintiffs have also moved to attach certain real estate in Worcester, Massachusetts owned by the Oftring Realty Trust, of which defendant is trustee. Rule 64, Fed.R.Civ.P. permits the

"seizure of person[al] or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action . . . in the [matter] provided by the law of the state in which the district court is held . . ." By analogy to *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), a § 1404 transfer case, this court should apply Massachusetts state law to determine the availability of the provisional remedy sought. Rule 4.1(c), Mass.R.Civ.P., provides that no property may be attached unless approved by court order "entered only after notice to the defendant and hearing and upon a finding by a court that there is a reasonable likelihood that the plaintiff will recover judgment . . . in an amount equal to or greater than the amount of the attachment . . ." The value of the property sought to be attached is $600,000 by plaintiffs' calculation. Count V, the sole count of the amended complaint in which Oftring is still a named defendant, alleges less than $100,-000 in damages as a result of plaintiffs' investment in Tilco and IFC stock. There is thus no "reasonable likelihood" that plaintiffs will recover a judgment of $600,000 against Oftring and the motion for attachment is denied.

Count V of the amended complaint is the sole remaining claim capable of withstanding a motion to dismiss. Several plaintiffs allege that misrepresentations were made by defendants Oftring & Co., Frank Oftring and Carpentier which induced these plaintiffs to purchase Tilco and IFC stock and caused them to lose their entire investment. The allegations of this count are entirely unrelated to the alleged scheme to inflate the market value of Haven stock. There is no reason for this court to retain control over this action simply to conduct pretrial proceedings with respect to Count V. This action was transferred to the Southern District of New York only because plaintiffs' allegations with respect to Haven bore great similarity to the allegations in *Binstein v. Haven Industries, Inc.*, 74 Civ. 4792 (LPG). Accordingly, this court recommends to the Judicial Panel on Multidistrict Litigation that this action be remanded to the District of Massachusetts pursuant to Rule 11 of the Panel's Rules of Procedure.

So Ordered.

Finally, Juanita Michaud and Gilberte Borowski have moved to intervene in this action pursuant to Rule 24(a), Fed.R.Civ.P. The cryptic motion papers state only that plaintiffs "purchased lots from American Industrial Research Corporation of Montreal, Canada, the purchase contract being countersigned by James M. Barrett, President of J & B Industries, Incorporated" and that plaintiffs were thereby defrauded. None of the parties named is a defendant in this action and no common questions of law or fact are apparent. The motion to intervene is denied.