Joseph F. FOGARTY, Jr., Appellee,

v.

SECURITY TRUST COMPANY, as Executor of the Estate of John E. McKinley, deceased, Appellant.

Joseph E. FOGARTY, Jr., Cross-Appellant,

v.

SECURITY TRUST COMPANY, Individually, and as Executor of the Estate of John E. McKinley, deceased, Lindsey Hopkins, and Sarah H. McKillips, Cross-Appellees.

No. 74–4084.

United States Court of Appeals, Fifth Circuit.

June 7, 1976.
Rehearing Denied June 30, 1976.

---

James D. Little, Robert L. Floyd, Miami, Fla., James A. Dixon, Sr., James A. Dixon, Jr., Miami, Fla., for appellant.

Timothy Armstrong, Kermit G. Kindred, Don G. Nicholson, Miami, Fla., for appellee.

Before DYER, CLARK and GEE, Circuit Judges.

CLARK, Circuit Judge:

This case presents appeals from cross summary judgments in favor of defendants and counter-defendants. Since issues of material fact remained to be tried, we reverse both judgments and remand for further proceedings.

Substantial facts are undisputed. Prior to his death in 1958, John E. McKinley owned and operated two companies: John E. McKinley, Inc., a general insurance brokerage, and McKinley & Company, a managing company which coordinated the operations of a marine insurance pool in which several insurance companies participated. At the time of McKinley's death, it became clear that the value of his estate would be determined by the value of the two companies, and that the affairs of the companies were in such disarray that the worth—if any—of these "assets" was not immediately ascertainable. Defendant Security Trust Company acted as executor of the McKinely estate. In this capacity Security Trust became sole stockholder of both McKinely companies and its trust officers undertook their management. Defendants Lindsey Hopkins, founder and board chairman of Security Trust, and Sarah Hopkins McKillips, Hopkins' sister and co-owner and a Security Trust director also became involved.

Although Security Trust rejected an offer to buy the McKinley companies for $450,000 in early 1962, its management of them was, to be charitable, less than successful. In September 1962, the London reinsurers of the McKinley pool informed Security Trust that unless the management of the McKinley interests were changed, they intended to terminate the reinsurance treaties effective January 1, 1963. The effect of such a termination would have been to put the McKinley companies out of business. At this juncture, the plaintiff, Joseph F. Fogarty, Jr., a Savannah, Georgia marine insurer, entered upon the scene. At first, Fogarty expressed an interest in buying the McKinley companies, but after noting "certain irregularities" in the McKinley

books, he retreated from this position. However, he did become manager of the McKinley business and a director of McKinley & Company.

The change in management achieved a short grace period for the McKinley operation, but in March of 1963 the London reinsurers demanded to inspect the books of the pool. As a result of this inspection, the reinsurance treaties were cancelled and the London underwriters sued in federal court to void the treaties from their beginnings in 1960. A Miami bank also sued to collect a $250,000 note from McKinley, Inc., which had used the proceeds to pay policy losses of McKinley & Company. The Florida Insurance Commissioner ordered McKinley & Company into receivership. McKinley, Inc., also ceased operations. The McKinley companies thus became worthless assets of the Estate of John E. McKinley. McKinley's widow filed suit against Security Trust for mismanagement of the estate; the case was dismissed on the ground that during the course of administration exclusive jurisdiction of such suits was vested in the County Judge's (probate) Court.

Despite the suits and the receivership, Security Trust did not close the McKinley business altogether, or render a final accounting of the estate. Rather, funds were advanced to an account known as the "Joseph F. Fogarty, Jr., Trust Account," which paid certain claims and judgments and a few employees' salaries. The exact source of these funds is not clear.

On December 11, 1963, at a meeting at the Security Trust offices, persons interested in the McKinely Estate [1] determined to activate a new concern, Associated (later American) Marine Underwriters, Inc. (AMU), for the purpose of rehabilitating and supplementing the insurance business theretofore carried on by McKinley, Inc. Risk acceptance and credit were discussed and plans formulated therefor. Hopkins volunteered to arrange for a $100,000 line of credit, and Thompson, the executive vice

president of Security Trust, was instructed to determine the most favorable interest available for such a line of credit. Fogarty was designated as president and a director of the new entity. Sole ownership remained in the hands of Security Trust in its capacity as executor.

At this point, the stories of the parties begin to diverge. Persons aligned with Security Trust, whether named as parties or not, emphasize that the long range purpose of this plan was to pump the business back to a $450,000 value, enabling the estate to arrange its sale to Fogarty and the executor to be rid of the responsibility and the potential legal liability for the McKinley quagmire. Fogarty, on the other hand, urges that Hopkins had, at this and all subsequent times, a personal financial interest in staying involved with McKinley/AMU.

For five years, AMU made fiscal progress under Fogarty's management, and in 1968 negotiations for a sale to Fogarty began. The first plan called for sale of AMU to a new concern called U.S. Underwriters, Inc., of Georgia, in which Hopkins and Fogarty each would hold fifty percent of the stock. It was abandoned when the parties determined that Hopkins' interest in both the executor-seller and the proposed buyer could create a legal impediment to the sale. Consequently, plans were made to sell all of AMU's stock to Fogarty for $450,000, Security Trust's long-time target price, and the accounting firm of Ernst & Ernst was retained to prepare an audit. Dated December 31, 1968, the audit showed $550,000 carried as a receivable from the "McKinley interests." Ostensibly, the item covered repayment of funds expended to cover the debts and operating costs of the McKinley businesses. Despite his knowledge that it could not be collected from the estate, Fogarty accorded it the status of an asset.

Then the stories completely part company. Fogarty says he treated the $550,000 item as valid because Hopkins promised to

---

1. These persons were identified in the memorandum of the meeting as Messrs. Lindsey Hopkins, Oscar Miller, A. W. Thompson, Paul D. Barns, Jr., Joseph Fogarty, Samuel A. Brodnax, Jr., Alonzo McNickle, and James A. Dixon.

compensate for the "worthless" claim by buying half of the AMU stock for this price at some time after Security Trust's execution of the McKinley estate ended. Hopkins says no such promise was made—that Fogarty knew all along the $550,000 would never be repaid in any form. The probate court approved the sale, and Fogarty paid $50,000 down and executed a note for the balance of the target price in September 1969. He made payments and operated the business through September 1972, at which time he demanded payment of the $550,000 item from Hopkins, McKillips and/or Security Trust. They refused. He stopped making payments on the note and filed this suit alleging a 10b–5 violation,[2] a violation of the Florida Securities Act,[3] and common law breach of contract. Security Trust counterclaimed for the balance due on the note. After considerable discovery, both sides moved for summary judgment on their claims and against those of the opposing party. The trial court granted both defensive motions on the ground that the parties were *in pari delicto* and that the plaintiff's attempt to prevail upon oral representations was barred by Florida's Statute of Frauds.[4]

■ Both summary judgments were improper because an unresolved issue of material fact remained as to the state of mind of the parties at the time of the agreement to sell AMU to Fogarty. Fogarty contends that Hopkins possessed the intent to defraud him at the time of the sale by inducing him to *accept* the sale on the basis of the worthless paper asset by advancing an equivalent value through his promise to buy

later. Hopkins says that no such promise was made. While it is obvious these differences make a dispute, it is not as clear that the dispute pertained to a "material fact."

■ First, Hopkins' state of mind is relevant to determination of federal jurisdiction in the circumstances of this case. The parties do not contest the use of an instrumentality of interstate commerce in the transaction.[5] Their clash concerns the facts that would establish whether a substantive violation of the federal statute and rule has been shown. We recently held, in a securities law context, that where the substantive and jurisdictional issues were "factually meshed," it was improper to determine jurisdiction before hearing testimony on the merits. *Spector v. LQ Motor Inns, Inc.,* 517 F.2d 278 (5th Cir. 1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 786, 46 L.Ed.2d 644 (1976). The approach taken by the trial court here leapfrogs that issue and decides the case by applying a substantive defense. *Spector* holds that the allegation of a federal cause of action creates jurisdiction to determine jurisdiction, not to assume it. *See* 517 F.2d at 286. Therefore, because the disputed facts going to the existence of the elements of plaintiff's cause of action go to both jurisdiction and merits, we hold that it was improper to decide the case without establishing them.[6] A more complete analysis of these facts appears next below.

The same intent of the parties is also pertinent to the applicability of the *in pari delicto* defense to the 10b–5 action. *Woolf v. S. D. Cohn & Co.,* 515 F.2d 595, 521 F.2d 225 (on petition for rehearing) (5th Cir.

---

**2.** Securities Exchange Act of 1934, 15 U.S.C. § 78j, 78t (1970); Rule X–10b–5, 15 C.F.R. § 240.10b–5 (1975).

**3.** Fla.Stat.Ann. §§ 517.01, 517.311 (1972 and Supp.1974).

**4.** Fla.Stat.Ann. § 725.01 (1969).

**5.** 15 U.S.C.A. § 78c(a)(17) (Supp.1976).

**6.** Had the facts been clearly established in a manner that made clear that no 10b–5 action was stated, it would have been within the discretion of the trial court to refuse to consider

the pendent state claims. *See Gibbs v. UMW,* 383 U.S. 715, 727, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966). Strong state interests in deciding this action would survive if the 10b–5 count were eliminated. Dismissal or retention of the remaining counts of course will depend on what the facts turn out to be. We intimate no views on the status of this question on remand. *See generally Gibbs v. UMW, supra; Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996, 1001–02 (5th Cir. 1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975).

1975), decided after the district court's ruling in this case, identified and evaluated the criteria for invocation of that doctrine. In *Woolf* this court declined to apply the doctrine to bar recovery where the plaintiff purchasers of certain convertible debentures first had misrepresented themselves as acting alone in the purchase when in fact they represented five other purchasers and by later claiming to represent *more* of such other persons than they actually did. After analyzing cases in this and other circuits in which *in pari delicto* had been discussed in a securities law context,[7] Judge Wisdom set out a two-part analysis:

(1) the fault of the parties must be "clearly mutual, simultaneous, and relatively equal;" and

(2) the effect on the investing public or on the implementation of important features of the regulatory scheme must be so small as to permit the Court to conclude that allowing the defense would not interfere with [regulatory] objectives.

521 F.2d at 227; 515 F.2d at 604. The panel went on to hold that *in pari delicto* would not apply in *Woolf* because the second criterion was not met, since the misrepresentations took place in the context of a private placement, where "abuses . . strike at the very heart of the protections the Securities Acts seek to afford investors . . . ." 521 F.2d at 227.

The *Woolf* opinions leave no doubt, however, that both parts of the test must be satisfied in order for the defense to be invoked. This case presents the converse of *Woolf*: a case in which there is insubstantial impact on the investing public, for the only member of that "public" here was Fogarty himself, but in which there may or

may not be "mutual, simultaneous, and relatively equal" fault. Establishment of the relative degrees of fault requires ascertainment of the intent of the parties at the time Fogarty agreed to assume the collectibility of the $550,000 item.

In our view, the present state of the evidence permits three possible resolutions of the dispute:

(1) Hopkins made no promise to Fogarty to repay or replace the $550,000 item in any way.

(2) Hopkins made the promise and intended to keep it.

(3) Hopkins made the promise but did not intend to keep it.

Either of the first two possible outcomes would preclude Fogarty's recovery in a 10b–5 action. Under (1), Fogarty must be regarded to have known and understood the financial consequences of allowing the paper asset to remain on the books and to have accepted that risk. Thus he would have failed to establish jurisdiction or to prove his case. Under (2), the case is not a 10b–5 action at all, but a breach of contract involving failure to perform a condition subsequent. Under (3), Fogarty's motives remain roughly the same—knowing participation in a self-dealing scheme. However, Hopkins' conduct would reveal a knowing, wrongful intent to use any improper means to rid himself of the potential legal liability to which he and his Security Trust cohorts were exposed. Were (3) the case, there would be jurisdiction and a serious question as to equality of fault would be presented. It is not a question for this court and the trial court has not permitted its full development to this stage. Certainly neither court should *assume* rather than determine that there are no equities to balance.[8]

7. *James v. DuBreuil*, 500 F.2d 155 (5th Cir. 1974); *Kuehnert v. Texstar Corp.*, 412 F.2d 700 (5th Cir. 1969); *Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969); *Can-Am Petroleum Co. v. Beck*, 331 F.2d 371 (10th Cir. 1964).

8. In this regard, we note that the record to date reflects no mismanagement by Fogarty; that reinsurers and customers trusted Fogarty, at least enough to accept him as manager where they would no longer accept Security Trust's

personnel; and that the threat of fragmentation of a business, such as marine insurance, that is heavily dependent upon continuing relations with policyholders might well be sufficient to force Fogarty's acquiescence in the phony-asset scheme in a manner similar to the dictated acquiescence in antitrust violations in *Perma-Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982

It is appropriate to note specifically what we do *not* hold in this case. We do not hold that the applicability of *in pari delicto* may not be determined on summary judgment.[9] We do not even hold that *in pari delicto* may not be found applicable after the facts of this very case are fully developed. We merely hold that the question of Hopkins' intent to defraud is so critical to the balancing of fault demanded by *Woolf's in pari delicto* analysis that it must be known before all material fact disputes can be said to be resolved.

 We also note that the district court commented in its orders below that the Florida statute of frauds barred recovery on Fogarty's claim. It is not clear whether the court intended this remark to reach all three claims alleged in the petition or merely to dispose of the pendent state claims on the assumption that the 10b–5 claim already had been removed from the case. Of course, state statutes of frauds do not bar recovery under 10b–5. *Cf. Wolf v. Frank,* 477 F.2d 467 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195 (5th Cir. 1960), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). In view of our disposition of the case, we express no opinion as to whether the state law claims are subject to the statutes of frauds.

Finally, because of the significant chance that the issue will arise again on remand, we deem it proper to state that the application of the equitable defense of *in pari delicto* to bar Security Trust's counterclaim on the note is not compelled by its use to bar Fogarty's claim. The note is a legal obligation enforceable in the absence of mistake or fraud. *See Manufacturers Finance Co. v. McKey,* 294 U.S. 442, 55 S.Ct.

444, 79 L.Ed. 982 (1935). However, a ruling that *in pari delicto,* as such, is not a reciprocal bar to both claim and counterclaim here does not preclude consideration of the same facts in the inquiry whether vitiating mistake or fraud was present in the creation of the contract. *See, e. g., In re Ace Sales Co.,* 357 F.Supp. 936, 941 (E.D.Mo.1973).

The judgments of the district court are reversed, and the case is remanded for proceedings not inconsistent with this opinion.

---

(1968), in which the Supreme Court discarded the *in pari delicto* doctrine in antitrust cases.

We further note that in both *James* and *Kuehnert, supra* note 7, the fault that was held to be equal was the complicity of both parties in a scheme to violate the federal securities laws, whereas here the only federal securities violation alleged is against defendants. The fault in which both parties participated was the

deception of the probate court. We are unwilling to rule as a matter of law that this mutual *state* delict should bar recovery on a valid 10b–5 claim, especially where the only offense against federal law was committed by the party that would retain its right of recovery on a common law obligation.

**9.** To do so would conflict with *Kuehnert v. Texstar Corp., supra* note 7.