**In re BELL & BECKWITH, Debtor.**

**Patrick A. McGRAW, Trustee,**

v.

**LIBERTY AIRLINES, INC., et al., Defendants.**

**No. C 88–7607.**

United States District Court, N.D. Ohio, W.D.

June 22, 1989.

Robert A. Bunda, Fuller & Henry, Toledo, Ohio, for debtor and trustee.

H. Buswell Roberts, Nathan & Roberts, R. Michael Frank, Green & Frank, Toledo, Ohio, for defendants.

## OPINION AND ORDER

WALINSKI, District Judge.

This matter is before the Court following a jury trial held from May 31, 1989 through June 2, 1989. At the close of plaintiff's case, the Court granted defendants' motion for directed verdict. Pursuant to the grant of directed verdict, the Court enters the following opinion. *See* Rule 52(a), Fed.R. Civ.P.; *Garrison v. Jervis B. Webb Co.,* 583 F.2d 258, 261 n. 3 (6th Cir.1978).

## FACTS

The plaintiff Patrick A. McGraw is the Trustee for the liquidation of the stock brokerage Bell & Beckwith, located in Toledo, Ohio. Starting in approximately 1973 and ending in February of 1983, Edward P. Wolfram, Jr. ("Mr. Wolfram"), the brokerage's managing partner, embezzled approximately $46,000,000 by diverting cash and securities held by the brokerage in customer margin accounts. In early February, 1983, the Securities and Exchange Commission discovered the fraud and this Court ordered the brokerage closed.

On February 16, 1983, after the commencement of the liquidation of Bell & Beckwith, both Mr. Wolfram and his wife, Zula Wolfram ("Mrs. Wolfram"), assigned all of their assets, interests, rights and property to the Trustee. At the time of the assignment, Mrs. Wolfram owned NEST, Inc. ("NEST"), an entity which owned 25,-000 shares of stock in defendant Liberty Airlines.

In 1982 and 1983, Liberty Airlines was involved in making an initial public offering of 400,000 shares of its common stock, with Bell & Beckwith as the underwriter. Before Liberty Airlines seriously considered making the public offering, defendant John Ayling ("Ayling"), a Liberty director and stock broker at Bell & Beckwith telephoned the law firm of Fuller & Henry and briefly inquired about the legal aspects of a public offering. However, Ayling made no further contact with Fuller & Henry concerning the offering and another law firm eventually handled it.

In anticipation of its public offering, Liberty Airlines sought approval to make the offering from the National Association of Securities Dealers ("NASD"). The NASD required, among other things, that certain Liberty officers and directors redeem a portion of their Liberty stock. Under NASD's redemption requirements, John Ayling ("Ayling"), a director of Liberty and a stock broker with Bell & Beckwith, was required to redeem 95,000 of his 170,000 shares before the public offering occurred. In addition, Mrs. Wolfram was required to redeem 5,000 shares.

On August 23, 1982, Ayling entered into a Stock Redemption agreement with Liberty whereby 95,000 of his shares were redeemed. In consideration for the redemption, Liberty agreed to pay Ayling $45,-750.00 for his redeemed shares out of the proceeds of the public offering. (Defendant's Ex. J). Even though Liberty states in its public offering prospectus that Ayling's and Mrs. Wolfram's shares had been redeemed on August 27, 1982, Liberty's secretary, Merle E. Pheasant ("Pheasant"), did not indicate the redemption in Liberty's share transfer journal. Additionally, neither Ayling nor Mrs. Wolfram surrendered any of their share certificates to Liberty in

connection with the redemption. At the time Ayling entered into the Redemption Agreement, he owned the following stock certificates for the indicated number of shares: no. 11 for 10 shares, no. 13 for 5 shares, no. 46 for 1 share, no. 47 for .5 share, no. 51 for .5 share, no. 94 for 19,998 shares, no. 95 for 74,985 shares, and no. 96 for 75,000 shares.

After obtaining approval for the public offering from NASD, Liberty sought to have its securities registered by qualification in Ohio under O.R.C. § 1707.09. The Ohio Division of Securities ("ODS") granted Liberty Airlines' application on September 17, 1982, conditioned on Liberty's compliance with its application materials, including those assertions it made in its prospectus. One of the terms which Liberty included in its prospectus was that certain officers, directors, or principal shareholders would place their "cheap stock" in escrow. This included any stock purchased by insiders at a significantly lower price than the five dollar per share public offering price. In order to comply with the ODS' registration requirements, Ayling was required to escrow all of his remaining 75,000 shares.

In July or August of 1982, Pheasant requested that those persons who were required to escrow their shares turn them over to him so that he could deposit them with the escrow agent. Ayling informed Pheasant that he could not find two of his certificates, numbers 11 and 13, which represented ten and five shares, respectively. Pheasant issued two new certificates to Ayling, numbered 11 and 13, for the same number of shares each. Pheasant did not reflect the issuance of the replacement shares in Liberty's share transfer journal nor did he place a legend on the new certificates indicating that they were replacements. Shortly thereafter, Ayling gave Pheasant the replacement certificates 11 and 13 for a total of 15 shares and certificate 95 for 74,985 shares to comply with the ODS requirement that he escrow his remaining stock. On September 17, 1982, Pheasant opened the escrow account.

The public offering went through on or about February 1, 1983. At that time, Bell & Beckwith became share transfer agent for Liberty and Pheasant turned over the share transfer journal to the brokerage. Although Liberty was to have used the proceeds of the offering to pay for the shares which it had previously redeemed, it did not do so. The shares which Ayling and Mrs. Wolfram had redeemed in August, 1982 remained in their accounts at Bell & Beckwith and both Ayling and Mrs. Wolfram had ready access to those shares.

A few days after the Liberty public offering closed, this Court ordered Bell & Beckwith closed because of the massive fraud perpetrated by Mr. Wolfram. After going through all of the property, desks, files, etc. at Bell & Beckwith, investigators found Ayling's two missing stock certificates, numbered 11 and 13, in his desk. In addition, investigators found a poster with several brokers' names on, including Ayling's, which offered a trip to Las Vegas for the top-seller of Liberty stock.

Liberty Airlines operated for over one year, but never became profitable. A price war forced Liberty to suspend flight operations on May 15, 1983. On June 2, 1983, Holland Industries, Inc. took over Liberty by purchasing 420,000 shares of Liberty stock or approximately 80% of Liberty's outstanding shares. (Plaintiff's Ex. 6-B, Stock Issuance Agreement).

At trial, Pheasant testified that when he reissued certificates 11 and 13 to Ayling, he did not record the reissuance in Liberty's share transfer journal, nor did he cancel the original 11 and 13 certificates. However, Liberty's share transfer journal contains entries, dated August 27, 1982, marking certificates 11, 13, 46, 47, 51 and 95, totalling 95,000 shares, as "redeemed." In addition, Mrs. Wolfram's shares are also marked as "redeemed." Pheasant testified that these entries were not made by him and that they must have been made sometime after he gave the transfer journal to Bell & Beckwith in February, 1983. At trial, Liberty's share transfer journal reflected that Ayling owned 75,000 shares, represented by stock certificate 96.

Before plaintiff rested, defendants presented a witness out of order and without objection. The witness, Michael Sigg, worked as an administrative assistant at Holland Industries at the time Holland took over Liberty. Sigg testified that he was instructed by his superiors to update Liberty's share transfer journal in June, 1983. Not knowing that Ayling's certificates 11, 13 and 95 were in escrow and that Ayling's other shares were the ones which were supposed to have been redeemed, Sigg redeemed all of Ayling's shares except the 75,000 shares represented by certificate 96. Sigg did this simply because he believed that it was best if Ayling's 75,000 shares were reflected in one certificate rather than three. To date, Ayling has not received payment for the redemption of his 95,000 shares.

The trustee brought this action against Liberty Airlines, Ayling, and others, seeking rescission of the sale of stock to NEST which occurred as a party of Liberty's public offering. As a result of a partial summary judgment in the Bankruptcy Court, and a settlement with the other remaining defendant indicated by the Trustee to the Court, Liberty Airlines and Ayling were the only defendants remaining for trial. This matter came before this Court for a jury trial because it is a non-core case in the bankruptcy of Bell & Beckwith.

## DISCUSSION

■ As this is a diversity case brought pursuant to Ohio law, Ohio law controls the issue of sufficiency of evidence to grant a motion for a directed verdict. *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1248 (6th Cir.1984). In Ohio, a directed verdict should be granted when,

after construing the evidence most strongly in favor of the plaintiff, reasonable minds could come to but one conclusion upon any determinative issue from the evidence submitted, and that conclusion is adverse to the plaintiff. Stated in other words, if, upon the evidence submitted, reasonable minds could differ upon the determinative issues involved, the motion should be overruled.

*Johnson v. Grant Hospital*, 31 Ohio App.2d 118, 122, 286 N.E.2d 308, 311, *rev'd on other grounds*, 32 Ohio St.2d 169, 291 N.E.2d 440 (1972).

The Trustee brought this action under O.R.C. § 1707.43, which states, in part:

Every sale or contract for sale made in violation of Chapter 1707 of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person who has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to such purchaser, in an action at law ..., unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

The Trustee seeks to void the sale of Liberty shares to NEST in the public offering on the grounds that Ayling and Liberty Airlines violated O.R.C. § 1707.09 by Ayling's failure to escrow all of his cheap stock, as required by the ODS. The Trustee contends that since Ayling and Liberty failed to complete the redemption of 95,000 shares owned by Ayling, those shares should have been put into escrow with Ayling's remaining 75,000 shares. In addition, the Trustee asserts that Ayling failed to escrow all of his shares because his original certificates 11 and 13 were never cancelled and remained in his possession until Bell & Beckwith closed.

Section 1707.09 of the Ohio Revised Code states that all securities, with limited exceptions, "shall, before being sold in this state, be qualified in the manner provided by this section." The section goes on to list the information which an applicant must submit to the ODS with the application for registration. The Trustee claims that since Ayling failed to comply with the ODS requirement that he escrow all of his cheap stock the Liberty Airlines stock was not properly registered by qualification under § 1707.09. Ayling moves for a directed verdict on the grounds that he is not liable under § 1707.43 because 1) he did not sell the securities in question to NEST, Mr. Wolfram or Mrs. Wolfram; 2) Mrs. Wol-

fram was not a purchaser of the NEST securities; 3) the securities owned by NEST were registered by the ODS at the time they were sold; 4) any possible violation of the ODS' escrow of redemption requirements was not material; and 5) the Trustee's claim is barred under a theory of *in pari delicto*.

The case law in Ohio concerning the issue of what constitutes "participation" in the sale of securities is relatively sparse. In *Miller v. Griffith*, 28 Ohio Op.2d 278, 196 N.E.2d 154 (Com.Pl.1961), the Columbiana County Court of Common Pleas held that a corporation's president, who had only signed a stock certificate which was later sold without having been registered, had participated in the sale of the stock. The Court stated that the signing of the certificate "contributed to this transaction and participated in the consummation of the transaction and, therefore, would be equally at fault...." *Id.* at 281, 196 N.E.2d at 157. In *Crane v. Courtright*, 2 Ohio App.2d 125, 206 N.E.2d 913 (1964), the Franklin County Court of Appeals held that one could be a seller of stock without necessarily being the issuer. The court of appeals noted that "[a] 'sale' includes a solicitation of a sale, a solicitation of an offer to buy, or an offer to sell, and whether any of these are done directly or indirectly." *Id.* at 127, 206 N.E.2d at 916. Finally, in *Hild v. Woodcrest Ass'n*, 59 Ohio Misc. 13, 391 N.E.2d 1047 (Com.P. 1977), the Montgomery County Court of Common Pleas held that an accounting firm which had prepared financial and investment information to attract investors had participated in the sale of securities. The Court held the accounting firm liable under § 1707.43 even though it requested that the association selling the securities to "engage an attorney ... [to] advise you concerning compliance with the several Federal Securities Laws, State Blue Sky Laws, and Securities Acts...." *Id.* at 29, 391 N.E.2d at 1057.

In the present case, Ayling was deeply involved in the affairs of Liberty and in the stock offering. While he did not actively sell securities in Liberty, many of his regular clients purchased Liberty shares in the public offering. (Plaintiff's Ex. 23). Furthermore, Ayling contacted the law firm of Fuller & Henry to see if it handled public offerings. While this does not show any active selling of shares on his part, it does show that Ayling was actively involved in the public offering. Finally, the fact that Ayling's name appeared on a poster regarding a contest selling Liberty stock indicates at least a slight level of involvement. These facts, coupled with Ayling's status as a director of Liberty, when construed most strongly in the Trustee's favor, prevent the Court from finding that a reasonable jury could not find that Ayling participated in the sale of the securities in question here. Accordingly, the Court denied defendants' motion for directed verdict on this basis.

Defendants also contend that the Trustee failed to present any evidence that Mrs. Wolfram purchased the Liberty stock which NEST owned. However, at trial the Trustee produced a claim form used to file claims in the Bell & Beckwith liquidation which indicates Mrs. Wolfram's ownership of NEST. The claim form is signed by Frank McManus, attorney for Mrs. Wolfram, as follows: "for Mrs. Wolfram—N.E. S.T. Inc" (Plaintiff's Ex. 4–B). Certainly, this is sufficient evidence for the jury to find that Mrs. Wolfram owned NEST. In addition, the Trustee presented the assignment wherein Mrs. Wolfram assigned all of her property to the Trustee. (Plaintiff's Ex. 2 and 3). While no evidence was presented concerning who may have purchased the stock originally, that information is unnecessary. In a prior order in this case, Judge Speer discussed this issue at length and determined that any cause of action a purchaser of stock may have under O.R.C. § 1707.43 is transferred with a general assignment of the stock. *In re Bell & Beckwith*, 89 B.R. 632, 639 (Bkrtcy.N.D. Ohio 1988). Judge Speer stated that:

After review of the relevant 'Blue Sky Law' cases and statutes, it appears that Ohio courts would uphold this assignment where both the right to the Liberty Airlines stock, and the cause of action before the Court, were assigned to the

Trustee. Accordingly, the Trustee 'stands in the shoes' of Mrs. Wolfram, and has standing to bring this action as a 'purchaser' under O.R.C. 1707.43.

This determination that the claim of the purchaser follows the assignment of the stock is, at this point, the law of the case and cannot now be challenged. Accordingly, the Court finds defendants' motion on this ground not well taken.

█ Defendants also contend that they did not violate O.R.C. § 1707.09 because the Liberty stock owned by NEST was properly registered by the ODS and the ODS never revoked or cancelled that registration. The Trustee contends that Ayling did not comply with the ODS' escrow requirements, thus putting defendants in violation of § 1707.09.

The cases which the Trustee has presented all deal with securities which were clearly and admittedly unregistered. The Trustee has not presented, nor can the Court find, any case dealing with the issue of whether §§ 1707.43 and 1707.09 create a private cause of action for rescission of a sale stock for noncompliance with an ODS imposed registration requirement. In reading § 1707.09, it appears that the Trustee has presented no evidence to show that defendants violated the express provisions of § 1707.09. The Trustee presented no evidence to show that defendants failed to have the Liberty stock registered by qualification, that they failed to submit a complete application for registration, or that they failed to pay the required filing fee. Section 1707.09 permits the ODS to require certain securities to be escrowed, but it does not require such. The Trustee asserts that because Ayling allegedly failed to comply with the ODS' escrow requirement, the securities in question either automatically becamed unregistered or the ODS' registration became ineffective.

Section 1707.09 does not contain any provisions dealing with the revocation or rescission of a registration of securities. However, § 1707.13 does. Section 1707.13 reads, in part:

Suspension and revocation of registration.

The division of securities may suspend the registration by description or by qualification of any securities ..., if the division finds that the issuer has violated sections 1707.01 to 1707.45, inclusive, of the Revised Code, or any lawful order or requirement of the division, has fraudulently conducted its business, or has been engaged in or is engaged or about to engage in deceptive or fraudulent acts, practices, or transactions; that such security is being disposed of or purchased on grossly unfair terms, in such manner as to deceive or defraud or as to tend to deceive or defraud purchasers or sellers, or in disregard of the lawful rules and regulations of the division....

This section vests power to suspend the registration of securities solely in the ODS. Therefore, this Court has no power to suspend the registration of Liberty's stock or question the validity of that registration. This Court concludes that it could only find defendants in violation of § 1707.09 if the Liberty stock which NEST owned had been sold without having been registered by the ODS. There is no violation of § 1707.09 merely because one of the ODS' orders or requirements was not complied with. The fact that Ayling failed to escrow the stock in his account at Bell & Beckwith, which should have been redeemed long before the public offering closed, may have been grounds for the ODS to suspend the registration, but it chose not to do so. In light of that fact, the Court cannot find defendants in violation of § 1707.09. Therefore, defendants' motion for directed verdict on the grounds that they did not violate § 1707.09 is well taken.

█ Even if the Trustee could assert, in the face of the ODS' refusal to suspend the registration of Liberty's stock, that defendants sold unregistered securities, such a violation would have to be material in nature. O.R.C. § 1707.43. The burden is on defendants to show that a violation is not material. *Biernbaum v. Midwest Oil & Gas Co.*, 108 Ohio App. 560, 566, 160 N.E.2d 410, 414 (1959). After considering the evidence most strongly in the Trustee's favor, the Court concludes that defendants

have shown that any violation of § 1707.09 which possibly occurred was not material, but merely technical in nature.

Section 1707.09 is designed to ensure that securities are not sold in Ohio unless the ODS has all relevant information about the securities and approves of the sale. The information which an applicant must provide to the ODS for the sale of stock includes information about the company which issued or is issuing the stock, its business, directors and officers, its underwriter (if any), and its financial and capitalization data. This is intended to provide investors with full information about the company whose stock they may purchase and to protect investors from fraudulent stock schemes. If part of the value paid for any securities to be sold is of doubtful value, the ODS

> may require that such securities be delivered in escrow to a bank in this state under such terms as the division may reasonably prescribe or require to prevent a deceitful misrepresentation or sale thereof, that such securities be subordinated in favor of those sold for sound value until they have a value bearing a reasonable relation to the value of those sold for sound value, or that a legend of warning specifying the considerations paid or to be paid for such securities be stamped or printed on all advertisements, [or] circulars ... used in connection with the sale of any securities of the same issue, or it may impose a combination of any two or more of these requirements.

§ 1707.09.

In Liberty's case, the ODS required that all of the outstanding cheap stock be escrowed and that it also be subordinate to the shares sold in the public offering. Furthermore, Liberty's prospectus contained a full statement concerning the immediate dilution of the stock sold in the public offering. Finally, the Liberty stock which Ayling held bore a legend which stated that it could "NOT BE TRANSFERRED UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUES, SUCH TRANSFER WOULD NOT VIOLATE THE PROVISIONS OF [the Securities Act of 1933], OR OTHER APPLICABLE LAWS." While such a legend did not prevent the transfer of the stock which Ayling had access to, it made the share certificates non-negotiable. Although Ayling could have, at any time, taken his original certificates 11 and 13 and his certificate 96 in his account and attempted to sell them, this was because of Pheasant's failure to cancel certificates 11 and 13 on Liberty's books and to redeem certificate 96. Ayling had no intention to try to sell these shares nor was he even aware that he could. Furthermore, had he so attempted, the information available to such possible purchasers on the certificates' legends and in Liberty's prospectus would have warned any investor about the stock and the risks involved in its purchase. Had the certificates' legends been complied with, an attorney could have easily discovered from Liberty's share journal and the prospectus that Ayling's stock either should have been redeemed or escrowed, and that it was subordinate to all other shares of Liberty. Finally, the ODS had full information concerning Ayling's identity and address, his investment in Liberty, and how much of his stock should have been redeemed or escrowed. Had Ayling been able to transfer his stock, the ODS would have had adequate information to begin proceedings against him. Accordingly, the Court concludes that a jury could have come to but one reasonable conclusion here: that if the Trustee possesses a private cause of action under §§ 1707.43 and 1707.09, and if there was a violation of § 1707.09, then defendants have shown the violation to be immaterial. Therefore, defendants' motion for directed verdict on this issue is well taken.

■ Finally, defendants contend that the Trustee's claim must fail because he "stands in the shoes" of Mrs. Wolfram, who also failed to escrow the stock in her account at Bell & Beckwith which should have been redeemed at least five months before the public offering closed. Again, Judge Speer addressed this issue in his previous order and concluded that the Trustee is free of any defense which defendants may have against Mrs. Wolfram based on fraud. *In re Bell & Beckwith,* 89

B.R. at 641. Judge Speer also noted that "for a defense based on *in pari delicto* to be allowed in securities cases, the fault of the parties must be 'clearly mutual, simultaneous, and relatively equal.' *Fogarty v. Security Trust Co.*, 532 F.2d 1029, 1033 (5th Cir.1976)." *Id.* The only new facts presented here are that Mrs. Wolfram had 5,000 shares in her account at Bell & Beckwith which should have been redeemed. Because they never actually were, Mrs. Wolfram had access to them. However, this does not raise Mrs. Wolfram's "fault" to be equal to Ayling's in this regard. Ayling, as a director of Liberty, had much greater access to Liberty's books and its officers and could have made sure that the shares were properly redeemed. As a director of Liberty he had much more of a duty to do this than Mrs. Wolfram, as well. Also, Ayling had 75,000 shares in his Bell & Beckwith account while Mrs. Wolfram only had 5,000 shares. Finally, it has become apparent through most of the proceedings related to the Bell & Beckwith liquidation that Mr. Wolfram handled most of his wife's investments. She quite often was not aware of what investments were in her name. If either Ayling or Mrs. Wolfram are at fault for not having escrowed all of their cheap stock, Ayling is certainly more at fault because he was in a much better position to know what actions should be taken with the stock and whether or not they actually were taken. Accordingly, defendants' *in pari delicto* defense is not well taken.

For the foregoing reasons, it is

ORDERED that defendants' motion for directed verdict is granted.

FURTHER ORDERED that judgment be entered in favor of defendants Ayling and Liberty Airlines and this cause be dismissed.